AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Dup


CLERK'S OFFICE
A TRUE COPY
Oct 31, 2022
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Safe Deposit Box # 2313 at Educator's Credit Union, 10811 W Park Place, Milwaukee, Wisconsin (Target Location F), as further described in Attachment A. | ) ) ) ) |

Case No. **22-M-1308 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____11-14-22_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____10-31-22 1:45 pm_____

*Judge's signature*

City and state: _____Milwaukee, Wisconsin_____

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

**Safe Deposit Box # 2313 at Educator's Credit Union, 10811 W Park Place, Milwaukee, Wisconsin (Target Location F)**. This is a safe deposit box rented by or otherwise associated with Jonte MARSHALL.

# ATTACHMENT B

## ITEMS TO BE SEIZED

A.    Fentanyl, cocaine, and any other controlled substance, packaging materials, devices, and materials used to prepare fentanyl, cocaine, and other controlled substances for distribution, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution;

B.    Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

C.    Cash, currency, and financial instruments;

D.    All items related to the purchase of cryptocurrency, money orders, or other financial instruments, including receipts and invoices;

E.    Proceeds of narcotics offenses, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the use, acquisition and disposition of items of value;

F.    Documents related to the rental, lease, or ownership of property and/or storage units;

G.    Paraphernalia for packaging, processing, cutting, diluting, weighing and distributing controlled substances, and for packaging cash drug proceeds, such as scales, funnels, heat sealing devices, plastic packaging, labels, stickers, presses, and money-counting devices;

H.    Documents related to rental, lease, or ownership of the search sites and other locations identified in the search warrant;

I.    Safe deposit box lease agreements and keys;

J.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances and individuals involved in that distribution;

K.    Firearms and any associated ammunition;

L.    Cellular phones, computers, and other electronic devices;

M.    Items that demonstrate use, ownership, access, or control of the Target Location or electronic devices located at the Target Location;

N.    With respect to any computer equipment or other electronic devices:

    1.    Passwords, encryption keys, and other equipment or devices that may be necessary to access and use the computer equipment;

    2.    Documents or other items demonstrating the presence or absence of computer software that would allow others to control the items, and presence or absence of security software designed to detect such malicious software;

    3.    Documents or other items demonstrating the attachment of other computer hardware or storage media;

    4.    Counter forensic programs and associated data that are designed to eliminate data;

    5.    Items in the paragraphs above that are stored in computer media, as well as media capable of being ready by a computer (such as external and internal computer hard drives, memory sticks and thumb drives) and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic magnetic computer impulses or data. These devices include but are not limited to computers, computer tablets, cellular telephones, computer components, external hard drives, thumb drives, media cards, and other computer-related electronic devices;

    6.    Any of the items described in the above paragraphs maintained in safes, desks, filing cabinets, or hidden compartments in the Target Location; and

    7.    Items in the paragraphs-above that are stored in electronic media, including media capable of being read by a computer (such as external and internal computer hard drives, memory sticks, CDs, and thumb drives), and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data (such as, including but not limited to, cellular telephones and tablets).

O.    Records and items, including all communications (to include email records, text messages and hard copy correspondence) related to the generation of income, and regardless of whether such income was acquired lawfully or unlawfully, including but not limited to:

    1.    employment, regardless of whether such employment is documented through this issuance of an IRS Form W-2 or Form 1099;

    2.    the actual or attempted brokering, purchase, sale (or re-sale), or posting for sale of vehicles; and

3. Records related to the operation of any corporations, limited liability companies, partnerships, sole proprietorships, or other business-generating entity, including but not limited to the following entities:

    a.    Blackout Entertainment LLC;
    b.    Blackout Investments LLC;
    c.    Blackout Holdings LLC;
    d.    Schweiger & Baumann Trucking LLC;
    e.    Schweiger & Baumann Logistics LLC; and
    f.    Twenty-Nine 11 Developments LLC

P.    Financial records for individuals and entities, including but not limited to records that include or reference the following: receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements and information, debit card statements and information, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns;

Q.    Records and items, including all communications (to include email records, text messages and hard copy correspondence), related to the payment (or non-payment) of Federal, State or local taxes by individuals and entities due and owing based upon the generation of income, including draft tax returns, payroll and excise tax returns and other return-related information;

R.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

S.    Books, records, receipts, notes, ledgers, airline tickets, hotel receipts, money orders, and other papers relating to the distribution of controlled substances;

T.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

U.    Photographs of individuals, associates, their property and their drugs; and

V.    Records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.



CLERK'S OFFICE
A TRUE COPY
Oct 31, 2022
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Safe Deposit Box # 2313 at Educator's Credit Union, )
10811 W Park Place, Milwaukee, Wisconsin (Target )
Location F), as further described in Attachment A. )

Case No. 22-M-1308 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§§ 841(a)(1); 843; & 846; 18 U.S.C. §§§ 1956; 1957; & 856(h) | Possession, distribution, and conspiracy to possess with the intent to distribute in excess of one kilogram of cocaine; Use of communication facility in facilitating the commission of a felony; Money laundering; & Conspiracy. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW COOPER (Affiliate)    Digitally signed by MATTHEW COOPER (Affiliate) Date: 2022.10.28 12:41:56 -05'00'

*Applicant's signature*

DEA TFO Matthew Cooper

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: 10-31-22

*Judge's signature*

City and state: Milwaukee, Wisconsin    Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**</u>

I, Matthew Cooper, being duly sworn, depose and state as follows:

**I.**   <u>**AGENT EXPERTISE AND KNOWLEDGE**</u>

1.     I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 25 years.  I have been a Detective for over 19 years and have been assigned to conduct narcotics investigations for over 18 years.  I was previously assigned to the Vice Control Division (Narcotics) as a Police Officer for over 2 years.  I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 14 years.   I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October 2008.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.     In connection with my official MPD and DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957 and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963.  I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.  I have participated in the execution of multiple federal search warrants.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.  I have participated in numerous investigations involving violations of State and Federal Narcotics Laws.  I have participated or assisted in numerous Federal and State search warrants for narcotic related offenses which have resulted in the seizure of United States Currency, vehicles, real estate,

1

and jewelry from individuals involved in narcotic trafficking.

4.      I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both State and Federal Narcotic Laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5.      Through training, experience, and discussions with other experienced agents;

a.      I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.      I am familiar with the appearance and street names of various drugs, including marijuana, heroin, methamphetamine, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c.      I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.      I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.      I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

g.      I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or

2

the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.     I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.     I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, or other locations over which they maintain dominion and control;

j.     I know large-scale drug traffickers often use electronic equipment such as telephones (landlines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.     I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, cryptocurrency exchanges or off-exchange cryptocurrency storage locations or devices, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l.     I know drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m.     I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession;

n.     I know drug traffickers and money launderers who amass the proceeds of their enterprise quite often secure their money within secure locations within their dominion and control,

3

often in their residences, businesses, and storage facilities, and often in safes or other secure containers, such as safety deposit boxes;

o.    I know large-scale drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people within the organization. As a result, people who traffic in controlled substances or launder money for such organizations will possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, gambling ledgers, and documents containing lists of names and addresses of criminal associates;

p.    I know individuals attempting to conceal their illegal activities will frequently place assets obtained with proceeds of criminal activity in the names of friends, relatives, trusted associates, or fictitious entities to avoid detection of these assets by the Internal Revenue Service and other government agencies. Even though these assets are in the names of others, the true owners will continue to exercise dominion and control over the use, ownership, and disposition of these assets;

q.    I know individuals attempting to conceal their illegal activities or otherwise involved in illegal activities will often purchase gifts or transfer cash and other assets to family members and friends in order to conceal the source of the funds or to otherwise launder the proceeds;

r.    I know individuals involved in illegal activities will utilize checking and savings accounts or safety deposit boxes at financial institutions in the names of relatives, friends, trusted associates, or fictitious business entities. These relatives and associates also conduct financial transactions on the individuals' behalf utilizing monetary instruments, including wire transfers of monies into foreign accounts outside the United States;

s.    I know individuals involved in illegal activities will frequently have some sort of legitimate income or funds and comingle their criminal profits with their legitimate funds. This helps conceal the illegal source. Monetary instruments can then be acquired against the funds in the account, or a check can simply be written on the account without creating any Currency Transaction Reports (CTRs) or Suspicious Activity Reports (SARs);

t.    I know individuals involved in illegal activities will frequently allow third parties and/or co-conspirators to make cash deposits to their bank accounts. An individual depositing currency is not always required to show identification to banking officials, therefore, a third party can go to a bank branch anywhere in the U.S. and deposit cash to an account that is not held in their name. Because the funds are deposited in cash, the account holder, who can be in a different State, can then go to their local bank branch and immediately withdraw the funds in cash. This method of transferring money provides for an almost instantaneous transfer of funds that could not be achieved through the shipping of bulk currency via common carrier and maintains the virtual anonymity of the third party making the deposit which would not be possible if transferring money through a wire service business such as Money Gram or Western Union;

4

u.      I know individuals who are attempting to conceal their illegal activities from the IRS and other government agencies commonly hide records that will establish their true ownership of assets. Such records typically include: bank statements, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, automobile titles, property deeds, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices; and

v.      I know individuals who seek to hide such records typically keep those records in a place that is secure but easily accessible, such as their personal residences, garages, automobiles, storage facilities, safety deposit boxes, briefcases, purses, and safes or security storage containers.

6.      In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above in paragraph 2 occurred and that probable cause exists to believe that locations described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

## II.      <u>LOCATION FOR WHICH SEARCH WARRANTS ARE SOUGHT</u>

8.      The target locations listed below are located in the Eastern District of Wisconsin, and more particularly described in Attachment A:

a.      **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A);**

b.      **1929 South 97th Street, West Allis, Wisconsin (Target Location B);**

c.      **1931 South 97th Street, West Allis, Wisconsin (Target Location C);**

5

d.      **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D);**

e.      **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E);**

f.      **Safe Deposit Box # 2313 at Educator's Credit Union, 10811 W Park Place, Milwaukee, Wisconsin (Target Location F);**

g.      **Storage Unit # 3118 located at Public Storage, 11122 West Lincoln Avenue, West Allis, Wisconsin (Target Location G).**

## III.   BACKGROUND AND SUMMARY OF THE INVESTIGATION

9.      The United States, including the Drug Enforcement Administration is conducting a criminal investigation into fentanyl trafficking by Jonte MARSHALL and the Jonte MARSHALL Drug Trafficking Organization, hereinafter referred to as the "Marshall DTO," in Wisconsin.  I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable;[1] and (b) financial records obtained via subpoena.   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

10.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841 (conspiracy to manufacture, distribute, and possess with the intent to distribute a controlled substance, distribution of a controlled substance, and possession with intent to distribute a controlled substance), have been committed, are being committed, and will be committed by Jonte MARSHALL, Shomari HOOPER, Lemonda WARD, Oscar RAMIREZ-RIVERA, Mirna MATA-TORRES, and others not yet identified.

## IV.   PROBABLE CAUSE

---

[1] Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6

11.     In April 2019, case agents met with a confidential source, hereinafter referred to as "CS-1."[2]   CS-1 provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area.  CS-1 identified Jonte MARSHALL as a large-scale distributor of heroin, cocaine, and marijuana in the Milwaukee area.   Case agents are aware, based on reviews of law enforcement databases, that Jonte MARSHALL has been identified as a large-scale distributor of narcotics in the Milwaukee, Wisconsin area since 2008.  CS-1 identified one of MARSHALL's phone numbers as (414) 779-1998, hereinafter referred to as "Target Cell Phone A."  CS-1 identified MARSHALL's residence as a duplex at **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**.  CS-1 stated this residence was a duplex owned by MARSHALL.  CS-1 stated MARSHALL lived in the lower unit of the duplex and stored drugs in the upper unit of the duplex.  CS-1 stated that MARSHALL carried a pistol on his person at all times.

12.     CS-1 believed that Jonte MARSHALL received at least some of his drugs through the mail.  On one occasion, CS-1 was at the residence of MARSHALL's associate, Corey Vance, when a third subject was at the residence waiting to receive a parcel believed to contain drugs.  CS-1 left the residence before the parcel arrived.  CS-1 stated MARSHALL owns a residence in Arizona and travels to Arizona frequently to conduct drug trafficking activities.

13.     CS-1 identified another subject involved in drug trafficking with Jonte MARSHALL as Corey Vance.  CS-1 stated Vance distributed large amounts of heroin, cocaine, and marijuana for MARSHALL.  CS-1 identified Vance's residence as 5908 North 69th Street, Milwaukee, Wisconsin.

---

[2] Case agents believe CS-1 is a reliable person because CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, CS-1 has provided statements against CS-1's own penal interests, and CS-1 has conducted controlled buys of narcotics for law enforcement.  CS-1's adult criminal history includes two misdemeanor convictions and one felony conviction.  CS-1 is cooperating in exchange for consideration on a pending felony arrest.  Criminal charges were subsequently declined based on CS-1's cooperation.  CS-1 was paid a total of $3,000 on four separate occasions for providing information on multiple felony offenses occurring in the Milwaukee area.

7

CS-1 stated Vance lived at this residence with his mother. CS-1 stated that within several days of the interview CS-1 had been inside that residence and seen five different handguns. CS-1 further stated that Vance always carried a handgun in his waistband. CS-1 stated Vance also stored drugs at this residence and observed about 100 grams of heroin in the residence about two weeks earlier.

14. CS-1 stated that when CS-1 would purchase heroin from Vance and MARSHALL, a girlfriend of MARSHALL's would arrive at the residence with the heroin. Vance would leave the residence with the money, meet with the unidentified girlfriend of MARSHALL, then return to the residence with the heroin. Despite CS-1's belief that MARSHALL and Vance distributed heroin; all of the suspected "heroin" seized to date has tested positive for fentanyl rather than heroin.

15. A review of DEA reports revealed that Jonte MARSHALL was interviewed at the Los Angeles International Airport on February 12, 2018. During that interview, MARSHALL stated he had approximately $12,000 in his checked bag. MARSHALL gave consent for law enforcement to search his bag where they located $14,845 concealed within clothing. Travelling with MARSHALL was Terrell Newman. Newman was also interviewed. Newman claimed to have approximately $15,000 in his carry-on bag. A consensual search of the bag revealed $43,530 concealed in a cologne box. Neither MARSHALL nor Newman had a legitimate explanation for the currency and gave conflicting statements about their travel plans and reasons for being in Los Angeles. A narcotics detecting canine alerted to the presence of the scent of narcotics on the currency recovered from both MARSHALL and Newman and both amounts of currency were seized by law enforcement. Case agents believe the seized currency constituted proceeds of drug trafficking.

16. Additionally, a review of law enforcement databases revealed that on December 7, 2018, a United States Postal Inspection Service Postal Inspector was conducting routine parcel screenings at the Milwaukee Processing and Distribution Center, located at 345 West St. Paul Avenue, Milwaukee, Wisconsin. The Inspector located a United States Postal Service Priority Mail Express parcel, bearing

8

tracking number EM621031509US, and found the parcel to be suspicious. This parcel was approximately 11.25" x 8.75" x 6" and weighed approximately 6 lbs. 13 oz. The shipping label for the parcel indicated it was from "Crystal James, 157 E Spruce Ave, Inglewood, CA 90301." The parcel bore a handwritten label addressed to "Linda Moore, 5908 N 69th St., Milwaukee, WI 53218." The parcel was postmarked December 6, 2018, in Los Angeles, CA 90017, and the postage paid was $78.90.

17. The Inspector located a phone number for the destination address of (414) 759-8379, registered to a "DS," and made contact with a subject who claimed to be "DS." "DS" stated he owned the property, and he did not rent the property to a "Linda Moore." "DS" said no one with that name has ever rented from him. "DS" gave consent to search the parcel.

18. On December 7, 2018, the Inspector opened the parcel and discovered a vacuum-sealed plastic bag containing two kilogram-shaped packages of suspected cocaine, weighing approximately 2051 grams. The suspected cocaine was field-tested and tested positive for Cocaine HCL. Case agents are aware that on December 7, 2018, 5908 North 69th Street, Milwaukee, Wisconsin, was the address of Corey Vance. Case agents believe this cocaine was destined for the MARSHALL DTO for distribution.

### Controlled Purchases of Drugs from the Jonte MARSHALL DTO

#### April 19, 2019, Controlled Purchase of Fentanyl

19. On April 18, 2019, CS-1 placed a recorded and monitored call to Corey Vance and asked Vance about purchasing "50" the following day, a reference to 50 grams of heroin. Telephone records show that a short time later Vance called Jonte MARSHALL at (414) 779-1998. Case agents believe Vance called MARSHALL to relay CS-1's request to purchase drugs.

20. On April 19, 2019, case agents established surveillance at the residence of Jonte MARSHALL and at the residence of Corey Vance. CS-1 was given $3,000 in pre-recorded buy money and an audio recording and monitoring device. CS-1 received a text message from Vance which told CS-1 to come to Vance's residence to complete the transaction. At about the same time, case agents

9

observed Jonte MARSHALL walk from the rear of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**. MARSHALL entered the driver's seat of a black Cadillac Escalade and backed out of the driveway. The vehicle was not followed.

21.     CS-1 travelled to Vance's residence. A short time later, case agents observed MARSHALL's black Cadillac Escalade arrive and park near Vance's residence. A few minutes later, Vance exited his residence and entered the front passenger seat of the Escalade. Vance exited the Escalade about 20 seconds later and re-entered his residence. The Escalade then departed the area followed by several surveillance units. A short time later, CS-1 exited Vance's residence. CS-1 was followed directly to a predetermined location where CS-1 turned over to case agents a clear plastic, knotted baggie containing a tan, chunky substance. CS-1 stated that VANCE delivered the drugs to CS-1 after leaving the residence briefly before returning. The substance later tested positive for fentanyl with a total weight of 50.0 grams.

22.     Surveillance followed the Cadillac Escalade to a local BMO Harris Bank at 3536 West Fond Du Lac Ave, Milwaukee, Wisconsin. Case agents later obtained surveillance video from the BMO Harris Bank branch. A review of the video showed MARSHALL enter the bank and meet with a bank teller. MARSHALL removed a large amount of United States currency from his pocket and deposited it to an account. Account records provided by BMO Harris bank show a $1,000.00 cash deposit was made to business checking account number x2263 (BMO x2263) on April 19, 2019. Information provided by BMO Harris Bank shows BMO x2263 was held in the name of Blackout Investments, **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**. MARSHALL was the only authorized signor listed on the account.

*May 8, 2019, Controlled Purchase of Fentanyl*

10

23.     On May 7, 2019, CS-1 placed a recorded and monitored call to Corey Vance and asked to purchase "A hundo," meaning 100 grams, the following day.  Vance replied, "Ok."  VANCE later told the CS, "I'm here now about to hit em rite now on da G."  A short time later, Vance sent a text message to CS-1 that read, "He said it's a go bro."  Case agents believe "he" is Jonte MARSHALL.

24.     On May 8, 2019, case agents met with CS-1 who was provided with $6,090 in pre-recorded buy money.  CS-1 was followed directly to 5908 North 69th Street, Milwaukee, Wisconsin, the residence of Vance.  Case agents established surveillance at the residence.  CS-1 entered the residence and then exited ten minutes later.  CS-1 returned to the predetermined meet location.  CS-1 related that VANCE went to a back bedroom of the residence, out of view of CS-1, for a short time before returning to the living room.  Vance then handed CS-1 a knotted, clear plastic baggie containing a tan, chunky substance.  CS-1 then exited the residence.  CS-1 believed that Vance had already received the fentanyl from MARSHALL when CS-1 arrived at the residence.  The suspected fentanyl later tested positive for fentanyl with a total weight of 99.5 grams.

### *May 31, 2019, Controlled Purchase of Fentanyl*

25.     On May 29, 2019, CS-1 placed a recorded and monitored call to Corey Vance and asked to purchase "a Hundy," meaning 100 grams, the following day.  Vance agreed.  A short time later, Vance sent a text message to CS-1 that read, "He say yeah around noon."  Again, case agents believe "he" is Jonte MARSHALL.  Vance sent another text message to CS-1 that read, "Don't forget yo Uber u remembered last time."  Case agents are aware, based on conversations with the CS that Corey Vance and Jonte MARSHALL charge the CS a transportation fee of $75 for delivering drugs to Vance's residence for the CS to pick up.  Vance refers to this fee as an "Uber Fare."  The CS verified that when Vance sent a text message reminding the CS not to forget the "Uber," Vance was referring to the $75 transportation fee.  The CS further stated that he/she believed this fee was paid to the female courier who

delivered the narcotics for MARSHALL. On May 30, 2019, VANCE sent CS-1 two text messages indicating the transaction could not take place until the following day. CS-1 agreed.

26. On May 31, 2019, case agents established surveillance in the area of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**. Case agents also established surveillance in the area of 5908 North 69th Street, Milwaukee, Wisconsin, the residence of Corey Vance. At 12:10 p.m., case agents observed a red 2019 Chevrolet Equinox, bearing Illinois license plates BF88637, stop in front of **1929/1931 South 97th Street**. These license plates list to PV Holding Corp, 10000 Bessie Coleman Drive, Chicago, Illinois 60666. Case agents are aware that PV Holding Corp is a holding corporation for Avis and Budget rental cars. An administrative subpoena served on PV Holding Corp revealed that this car had been rented by Jonte MARSHALL. At 12:15 p.m., case agents observed Jonte MARSHALL walk from **1929/1931 South 97th** Street wearing shorts and no shirt. MARSHALL approached the front passenger window of the Equinox and handed an unknown object about the size of an envelope to the female driver. MARSHALL engaged in conversation with the female driver for several minutes before the Equinox drove away.

27. Case agents met with CS-1 at a predetermined location. CS-1 was provided with $6,075 in pre-recorded buy money. CS-1 was followed directly to 5908 North 69th Street, Milwaukee, Wisconsin. A short time later, case agents observed the red 2019 Chevrolet Equinox, bearing Illinois license plate BF88637, arrive in the 5900 block of North 69th Street. The Equinox eventually stopped across from 5908 North 69th Street. The female driver of the Equinox exited the vehicle, crossed the street, and entered 5908 North 69th Street. About two minutes later, the female driver of the Equinox exited the residence and returned to the driver's seat of the Equinox. The vehicle drove out of the area.

28. CS-1 was followed directly to the predetermined meet location where CS-1 met with case agents. CS-1 handed case agents a knotted sandwich bag containing a tan, compressed substance. CS-

12

1 stated that Vance asked if the money included the "Uber." Vance told CS-1, "she said she was going to be pulling up." Vance walked down the front stairs of the residence and then returned to the residence before delivering the drugs to CS-1. The suspected fentanyl later tested positive for fentanyl with a total weight of 99.8 grams. Based on the investigation to date, case agents believe the female driver of the Equinox was Lemonda WARD as WARD has been observed on other occasions meeting with MARSHALL while driving a rental vehicle, rented by MARSHALL, and then immediately delivering fentanyl. Case agents believe MARSHALL delivered the fentanyl to WARD, WARD delivered the fentanyl to Vance, and Vance delivered the fentanyl to the CS.

### *July 19, 2019, Controlled Buy of Fentanyl*

29.     On July 18, 2019, CS-1 placed a recorded and monitored call to Corey Vance and asked to purchase "a hundy ball," meaning 100 grams, the following day. Vance replied, "Ok." On July 19, 2019, Vance directed CS-1 to meet him at an apartment located at 7100 North 60th Street #204, Milwaukee, Wisconsin. A short time later, case agents established surveillance in the area of 7100 North 60th Street, Milwaukee, Wisconsin. CS-1 was provided with $6,075 in pre-recorded buy money. CS-1 was followed directly to 7100 North 60th Street, Milwaukee, Wisconsin where Vance let CS-1 into the building.

30.     About four minutes later, CS-1 exited the apartment building and returned to CS-1's vehicle. CS-1 was followed directly to the predetermined meet location where CS-1 met with case agents and handed over a knotted sandwich bag containing a tan, compressed substance. CS-1 stated Vance went to a bedroom of the residence before emerging shortly thereafter when he handed CS-1 the suspected drugs and CS-1 left the apartment. The suspected fentanyl later tested positive for fentanyl with a total weight of 99.5 grams. A review of court-authorized tracking data for MARSHALL's Cadillac Escalade revealed that the vehicle travelled to the apartment building at 7100 North 60th Street, Milwaukee, Wisconsin, on July 20, 2019, at 5:19 p.m. and remained at the location for over two hours

13

and 45 minutes. Case agents believe MARSHALL drove the Escalade to that location to pick up the money CS-1 had used to purchase the fentanyl from Corey Vance on July 19, 2019.

*August 26, 2019, Controlled Buy of Fentanyl*

31.     On August 25, 2019, CS-1 placed a recorded and monitored call to Corey Vance and asked to purchase the "same way" the following day, a reference to 100 grams, the following day. Vance stated, "Yep. Let me, uh...I'm finna hit him right now." Case agents believe "him" is a reference to Jonte MARSHALL.

32.     On August 26, 2019, case agents established surveillance in the area of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)** and at 7100 North 60th Street, Milwaukee, Wisconsin, the residence of Corey Vance. Case agents met with CS-1 at a predetermined meet location. CS-1 was also provided with $6,075 in pre-recorded buy money. CS-1 then left the predetermined meet location and drove directly to 7100 North 60th Street, Milwaukee, Wisconsin.

33.     Approximately seven minutes later, case agents observed Jonte MARSHALL walk from **11929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)** and enter a black Cadillac Escalade which was in the driveway. MARSHALL was followed to the Starbucks parking lot at 7335 West Good Hope Road where he parked on the west side of the building at 1:06 p.m. Surveillance units temporarily lost sight of MARSHALL and his vehicle. At 1:09 p.m., surveillance observed MARSHALL backing out of the parking space. MARSHALL exited onto West Good Hope Road and turned north on North 76th street. About one minute later, a silver Jeep Grand Cherokee, bearing Illinois license plate BK35409, entered the parking lot of 7100 North 60th Street, Milwaukee, Wisconsin. These license plates also list to PV Holding Corp, 10000 Bessie Coleman Drive, Chicago, Illinois 60666. An Administrative Subpoena later revealed the vehicle had been rented by Jonte MARSHALL. The Jeep was occupied

14

only by an African American female driver. A short time later, case agents observed Vance exit the north exterior door of 7100 North 60th Street, Milwaukee, Wisconsin and approach the driver's window of the Jeep Grand Cherokee. At 1:14 p.m., Vance walked away from the Jeep and walked back into the apartment building.

34.     The Jeep drove out of the parking lot and was followed to the 7500 block of West Fond du Lac Avenue, the Jeep pulled to the curb behind Jonte MARSHALL's black 2018 Cadillac Escalade, which was already parked at the curb. Case agents observed Jonte MARSHALL exit the driver's door of the Escalade and enter the front passenger seat of the Jeep. MARSHALL stayed in the Jeep for several minutes and eventually returned to the Escalade and drove out of the area.

35.     As this was occurring, CS-1 exited the apartment building and returned to CS-1's vehicle. CS-1 was followed directly to the predetermined meet location where CS-1 met with case agents and handed them a knotted sandwich bag containing a tan, compressed substance, suspected fentanyl. CS-1 stated that CS-1 handed Vance the $6,075 in prerecorded buy money, which Vance counted. Vance explained that they were waiting for the drugs to arrive. At one point, Vance received a phone call and then told CS-1 that "Black" (Jonte MARSHALL) would arrive in seven minutes with the drugs. Vance left the apartment and a few minutes later returned to the apartment. VANCE handed CS-1 the suspected drugs. The suspected fentanyl tested positive for fentanyl with a total weight of 99.3 grams.

36.     Based on the investigation to date, case agents believe the female driver of the Jeep was Lemonda WARD as WARD has been observed on other occasions meeting with MARSHALL while driving a rental vehicle, rented by MARSHALL, and then immediately delivering fentanyl. Additionally, WARD was identified during a subsequent fentanyl delivery in which she was observed driving the same Jeep Cherokee. Case agents believe MARSHALL delivered the fentanyl to WARD

15

near the Starbucks on West Good Hope Road.  WARD then delivered the fentanyl to Vance and Vance delivered the fentanyl to the CS.

37.     Additionally, case agents reviewed Milwaukee Police Department (MPD) records and located a "Parking Trouble" investigation on August 13, 2019, at 7600 West Capitol Drive, Milwaukee, Wisconsin.  The records indicated that MPD Police Officers made contact with the 4-door silver Jeep with Illinois license plate BK35409 which was parked in a handicap parking spot.  The CAD entries indicate that the Officers conducted a wanted check of Lemonda A. WARD during this encounter and later issued a citation.  Case agents reviewed MPD body-worn camera video from this incident.  During the encounter, an Officer approached the driver of the Jeep as she exits the Walgreens store at that location.  The driver provided her driver's license which identified her as Lemonda WARD.  Officers conducted a wanted check of WARD before returning her driver's license.  WARD was issued a citation for parking in the handicap parking space and was released from the scene.  Case agents believe this also indicates WARD was the driver of the Jeep on August 26, 2019.

### *September 26, 2019, Controlled Purchase of Fentanyl*

38.     On September 25, 2019, CS-1 placed a recorded and monitored call to Corey Vance and asked for a "nifty," a slang term CS-1 used to mean "fifty," the following day.  Vance agreed.  On September 26, 2019, case agents established surveillance in the area of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**.  As case agents arrived in the area, they observed the same silver Jeep Grand Cherokee, bearing Illinois license plate BK35409, driving north on South 98th Street from West Lincoln Avenue.  As described above, this Jeep had been rented by Jonte MARSHALL and had previously been observed during a controlled buy of fentanyl from Corey Vance on August 26, 2019.  The Jeep was occupied only by an African American female driver at that time.  The Jeep stopped in front of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin**

16

(**Target Location C**). Case agents observed Jonte MARSHALL walking from the residence toward the Jeep. MARSHALL approached the front passenger window of the Jeep and had a conversation with the driver. Approximately three minutes later, the Jeep drove away southbound on South 97th Street and was not followed. MARSHALL walked back toward the residence. Surveillance units also established surveillance at 7100 North 60th Street, Milwaukee, Wisconsin, the residence of Corey Vance. About 20 minutes after the Jeep left MARSHALL's residence, case agents observed the Jeep parked in front of the apartment building. Case agents observed Corey Vance walk from 7100 North 60th Street and enter the front passenger seat of the Jeep. Case agents viewed a photo of Lemonda WARD and identified her as the driver of the Jeep.

39. Case agents met with CS-1 at a predetermined meet location where CS-1 was provided with $3,075 in pre-recorded buy money. CS-1 then drove directly to 7100 North 60th Street, Milwaukee, Wisconsin**.** Vance subsequently exited the Jeep and walked back toward the front doors of the apartment building. A few minutes later, CS-1 arrived at 7100 North 60th Street and parked in the parking lot before being let into the apartment building by Vance. About six minutes later, CS-1 exited the building and drove to the predetermined meet location. CS-1 handed case agents a knotted sandwich bag containing a tan, compressed substance, suspected fentanyl. CS-1 stated that CS-1 handed Vance the $3,075 in prerecorded buy money, which Vance counted. Vance handed CS-1 the suspected drugs. The suspected fentanyl tested positive for fentanyl with a total weight of 49.3 grams.

40. On October 11, 2019, Corey Vance died of natural causes. CS-1 attended a funeral service for Vance and met with Jonte MARSHALL. MARSHALL directed CS-1 to start purchasing fentanyl from Shomari HOOPER. CS-1 agreed.

*November 26, 2019, Controlled Purchase of Fentanyl*

41. On November 24, 2019, CS-1 placed a call to Shomari HOOPER and requested to purchase "fifty" the following day. HOOPER agreed. On November 25, 2019, CS-1 exchanged a series

17

of text messages and phone calls with HOOPER regarding the availability of drugs they had discussed the day before. HOOPER advised that HOOPER was now in possession of the drugs CS-1 wanted to purchase and the transaction could take place the following afternoon. The CS agreed.

42.     On November 26, 2019, case agents met with CS-1 at a pre-determined meet location. The CS was provided with $3,075 in pre-recorded buy money and a monitoring device. Surveillance units established surveillance in the area of HOOPER's residence, 3832 North 51st Boulevard, Milwaukee, Wisconsin. The CS was followed from the predetermined location directly to the alley behind 3832 North 51st Boulevard. CS-1 stopped behind 3832 North 51st Boulevard. About four minutes later, case agents observed Shomari HOOPER walk from the area of the residence and enter the front passenger door of CS-1's vehicle. About one minute later, case agents observed HOOPER exit the front passenger seat of CS-1' vehicle and walk back toward the residence. The CS then drove out of the alley and drove to a predetermined location.

43.     Case agents met with CS-1 who turned over a knotted, clear plastic baggie containing suspected fentanyl. CS-1 stated that after HOOPER entered CS-1' vehicle, CS-1 gave HOOPER the pre-recorded buy money and HOOPER gave CS-1 the paper towel containing the drugs. HOOPER and CS-1 then had a conversation about the quality of the drugs HOOPER delivered to CS-1. HOOPER told CS-1 how much cutting agent HOOPER added to his drugs after he purchased them and prior to selling it to his customers. The suspected fentanyl tested positive for fentanyl with a total weight of 50.85 grams.

### *February 5, 2020, Controlled Purchase of Fentanyl*

44.     On February 4, 2020, CS-1 spoke to Shomari HOOPER and told HOOPER CS-1 wanted to purchase "fifty." HOOPER agreed and said he would call "Black" to get the heroin. Case agents are aware that "Black" is the nickname of Jonte MARSHALL. CS-1 agreed. Later that day, HOOPER sent a text message to CS-1 that read, "He said tonight bro." CS-1 sent a text message back to HOOPER that

18

read, "Can you see if we can do it for first thing in the morning?" HOOPER sent a text message to CS-1 that read, "I'll just grab it and you can pull up in da morning bro."

45. On February 5, 2020, CS-1 was provided with $3,075 in pre-recorded buy money and a monitoring device. CS-1 was followed directly to the alley behind 3832 North 51st Boulevard. Case agents then observed CS-1 exit CS-1's vehicle and enter the rear door of 3832 North 51st Boulevard. Case agents observed CS-1 exit the rear door of 3832 North 51st Boulevard about one minute later. Shomari HOOPER also exited the residence and showed CS-1 a vehicle parked behind the residence. A few minutes later, CS-1 entered CS-1's vehicle and drove to a predetermined meet location. Upon arrival at the pre-determined location, case agents met with CS-1 who turned over a knotted, clear plastic baggie containing suspected fentanyl. CS-1 stated that upon arriving in the alley CS-1 received a call from HOOPER who told CS-1 to come in the house. CS-1 then entered the back door of the residence and met with HOOPER in the kitchen. CS-1 handed HOOPER the pre-recorded buy money and HOOPER handed CS-1 the paper towel wrapped around the drugs. The suspected fentanyl tested positive for fentanyl with a total weight of 50.9 grams

*April 23, 2020, Controlled Purchase of Fentanyl*

46. On April 20, 2020, CS-1 spoke to Shomari HOOPER and requested to purchase 100 grams of fentanyl the following day. HOOPER told CS-1 he would call "Fam" to see if the drugs would be available the next day. CS-1 later informed case agents that "Fam" was a nickname for Jonte MARSHALL. CS-1 continued to negotiate with CS-1 in the following days. On April 23, 2020, CS-1 and HOOPER exchanged a series of text messages regarding the availability of the drugs CS-1 asked to purchase. The court-authorized trap and trace device installed on MARSHALL's cellular phone showed incoming calls from Lemonda WARD at 3:23 p.m. and 3:40 p.m. At 3:41 p.m., case agents monitoring a remote surveillance camera installed to monitor the alley behind HOOPER's residence at 3832 North 51st Boulevard, Milwaukee, Wisconsin, observed a black 2012 Nissan Armada, bearing Wisconsin

19

license plates AGG-1210, drive north in the alley and stop behind the residence. These license plates list to Lemonda WARD. No one entered or exited the vehicle. The pen register on MARSHALL's phone showed that MARSHALL sent text messages to HOOPER at 3:43 p.m., 3:45 p.m., and 3:46 p.m. The trap and trace device also showed an incoming call from WARD at 3:46 p.m. The pen register then showed two outgoing calls to HOOPER at 3:47 p.m. Case agents believe MARSHALL was trying to contact HOOPER to tell him that WARD had arrived at his residence and that MARSHALL was coordinating the meeting between HOOPER and WARD.

47.     About seven minutes later, case agents were still monitoring the surveillance camera and observed the Nissan Armada back up in the alley. Case agents then observed HOOPER's white Dodge Challenger drive north in the alley. It appeared that the Armada had moved so HOOPER could drive onto the parking slab behind the residence. HOOPER then walked from the Challenger and entered the front passenger seat of the Armada. Approximately ten seconds later, HOOPER exited the Armada and walked toward the residence. Approximately two minutes later, HOOPER sent a text message to CS-1 that read, "Come on bro." HOOPER then walked back to the Armada and entered the front passenger seat. Approximately eight seconds later, HOOPER exited the Armada and walked back toward the residence. The Armada then drove north in the alley.

48.     Case agents met with CS-1 at a predetermined location. CS-1 was provided with $6,075 in prerecorded buy money and a monitoring device. Case agents followed CS-1 directly to the alley behind 3832 North 51st Boulevard. Case agents monitoring the remote surveillance camera observed HOOPER exit the rear door of the residence. HOOPER walked to CS-1' vehicle and entered the front passenger seat. Less than one minute later, HOOPER exited the vehicle and returned to the residence.

49.     CS-1 was followed to a predetermined location where he/she met with case agents. CS-1 provided case agents with a clear plastic, knotted baggie contained a tan compressed substance, suspected to be fentanyl. CS-1 related that after HOOPER entered CS-1' vehicle CS-1 provided the

20

prerecorded buy money to HOOPER and HOOPER gave CS-1 the suspected fentanyl. HOOPER also told CS-1 that HOOPER had obtained an additional 150 grams of fentanyl for his own distribution. The suspected fentanyl that was purchased tested positive for fentanyl with a total weight of 99.5 grams. Case agents believe Lemonda WARD, driving the Nissan Armada, delivered the fentanyl to HOOPER before HOOPER delivered it to the CS.

### *June 23, 2020, Controlled Buy of Fentanyl*

50.     On June 22, 2020, CS-1 placed a call to Shomari HOOPER and requested to purchase 100 grams of drugs from HOOPER. HOOPER agreed. HOOPER and CS-1 later agreed the transaction would take place the following day. On June 23, 2020, CS-1 was provided with $6,075 in prerecorded buy money and a monitoring device. Case agents established surveillance in the area of HOOPER's residence, 3832 North 51st Boulevard, Milwaukee, Wisconsin. Case agents followed CS-1 directly to the alley in the 3800 block of North 51st Boulevard. CS-1 parked in the alley behind 3832 North 51st Boulevard and remained seated in CS-1's vehicle. CS-1 placed several calls to HOOPER that went unanswered. A short time later, case agents observed Shomari HOOPER walk from the residence and enter the front passenger seat of CS-1' vehicle. About two minutes later, case agents observed HOOPER exit the front passenger seat of CS-1' vehicle and walk back toward the residence.

51.     CS-1 was followed to a predetermined location where case agents met with CS-1 who provided case agents with a clear plastic, knotted baggie containing a tan compressed substance, suspected to be fentanyl. CS-1 related that HOOPER walked from the house and entered CS-1' vehicle. Once HOOPER was in the vehicle, CS-1 provided the prerecorded buy money to HOOPER and HOOPER gave CS-1 the suspected fentanyl. The suspected fentanyl tested positive for fentanyl with a total weight of 101.0 grams.

### *November 6, 2020, Controlled Purchase of Fentanyl*

52.     On November 3, 2020, CS-1 met with HOOPER in person and discussed a purchase of heroin[3].  HOOPER agreed to sell 100 grams of heroin to CS-1 at noon the following day. It was also agreed the transaction would take place at HOOPER's residence, 3832 North 51st Boulevard, Milwaukee, Wisconsin.  CS-1 also told HOOPER that "something had happened" to Jonte MARSHALL and he was laying low for the time being.  HOOPER stated that he, meaning HOOPER, was distributing all the heroin for MARSHALL and had been really busy.  On November 4, 2020, CS-1 exchanged a series of text messages with HOOPER.  Case agents believe HOOPER indicated he still had to prepare the drugs for distribution.   Negotiations regarding this transaction continued until November 6, 2020.

53.     On November 6, 2020, CS-1 received a text message from HOOPER that told CS-1 HOOPER was ready.   Surveillance units established surveillance at 3832 North 51st Boulevard, Milwaukee, Wisconsin.  Case agents met with CS-1 at a predetermined location.  CS-1 was provided with $6,075 in pre-recorded buy money and an audio monitoring device.  Case agents followed CS-1 directly to the alley in the 3800 block of North 51st Boulevard.  CS-1 parked in the alley behind 3832 North 51st Boulevard.  A short time later, case agents observed a black 2011 Dodge Durango, bearing Wisconsin truck license plate SK9107 drive north into the alley between North 51st Boulevard and North 50th Street from West Vienna Street.  These license plates list to Rae Shonda T Love, of 2876 North 48th Street, Milwaukee, Wisconsin 53210.  The vehicle is known to be driven by Shomari HOOPER. Case agents observed the Durango stop in front of CS-1' vehicle and observed HOOPER exit the driver's seat of the Durango and begin to walk toward the rear of 3832 North 51st Boulevard.   HOOPER motioned for CS-1 to follow him.  Case agents observed CS-1 exit CS' vehicle and follow HOOPER toward the back door of the residence.  HOOPER and CS-1 entered the rear door of the residence.

---

[3] As described above, all "heroin" purchased from HOOPER has tested positive only for fentanyl.

22

54.     Seven minutes later, CS-1 exited the rear door of the residence and entered CS-1' vehicle. CS-1 then drove to a predetermined location where case agents met with CS-1.  CS-1 provided TFO case agents with a clear plastic, knotted baggie contained a tan flaky substance, suspected to be fentanyl.  CS-1 related that after arriving in the alley CS-1 tried to call HOOPER several times, but the calls were unanswered.  After about 30 minutes CS-1 observed HOOPER drive into the alley in a black Dodge Durango.  HOOPER got out of the Durango and waved for CS-1 to come to the house with him.  CS-1 followed HOOPER into the house and into the basement of the residence.  Once in the basement, CS-1 handed HOOPER the pre-recorded buy money and HOOPER handed CS-1 a baggie of what CS-1 believed to be heroin.  CS-1 observed what CS-1 believed to be approximately 300 additional grams of heroin on a basement bar along with a blender.  CS-1 stated that HOOPER told CS-1 that "Black," whom CS-1 knows to be Jonte MARSHALL, was laying low and didn't want to keep distributing all of the drugs himself.  HOOPER told CS-1 that MARSHALL was giving the drugs to HOOPER "uncut."  HOOPER stated the "heroin" was of such high quality that it could be cut three times without losing too much quality.  HOOPER stated the heroin given to CS-1 had only been "cut" once.  CS-1 then left the residence and drove to the predetermined meet spot.  The suspected fentanyl tested positive for fentanyl with a total weight of 100.0 grams.

### *Jonte MARSHALL Purchases of Cutting Agents and Presses*

55.     On March 20, 2020, a United States Postal Inspector was conducting routine parcel screening at the United States Postal Service ("USPS") Root River Post Office, located at 11015 W Oklahoma Avenue, Milwaukee, Wisconsin 53227, when the following parcel was found to be suspicious in nature: USPS Priority Mail parcel 9405503699300286995365.  The parcel was approximately an 11.25" x 8.75" x 6" USPS medium flat rate Priority Mail parcel weighing approximately 5 lbs. 8 oz.  The parcel's label indicated it was from "The Variety Shoppe, PO Box 315, Dawsonville GA 30534-0006."  The parcel bore a typewritten label addressed to "Jonte Marshall, 1929 S 97th St, West Allis WI 53227-

23

1430" (**TARGET LOCATION C**). The parcel was postmarked on March 18, 2020, in Dawsonville, Georgia 30534. The postage paid was $15.05.

56.     The sender of the parcel, The Variety Shoppe, has a website, www.varietyshoppe.com, showing a number of products they sell including digital scales, detox products, sexual stimulants, room deodorizers, and "powdered vitamins." Their homepage shows the "top selling powdered vitamin supplements" as mannitol, inositol, niacinamide, lactose, and VitaBlend. Case agents are aware mannitol, inositol, and lactose are common cutting agents added to narcotics prior to distribution. The website further states, "our customers receive an e-mail after the order is shipped containing an estimated time of arrival and a tracking number for the order."

57.     A check of USPS business records showed that since June 2018 the destination address of the parcel, **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**, has received over 30 packages originating from Dawsonville, Georgia. At least ten of these packages have all been from the same sender address as the parcel sent on March 18, 2020 and have all shown the same approximate weight as this parcel. The USPS business records were not kept for the remaining 20 parcels. Postal Inspectors were unable to confirm the sender's name and address of these parcels but suspects they all originated from the Variety Shoppe due to the type of USPS shipment used, the originating Post Office, and the weight of the parcels being the same as this parcel.

58.     On March 20, 2020, case agents applied for and received a federal sneak and peek search warrant for the parcel. The search warrant was issued by United States Magistrate Judge Nancy Joseph in the Eastern District of Wisconsin. Upon executing the search warrant on the parcel on March 20, 2020, case agents discovered the parcel contained two containers of Seven Stars Superior Lactose in powder form. The label for each container showed they each contained "2.2 lbs./1000 grams" of lactose. The parcel also contained a packing slip which showed the order was taken by The Variety Shoppe from

24

Jonte MARSHALL with an email address of ldtr_black@yahoo.com[4].   Case agents repackaged the parcel with all of its original contents and placed it back into the mail stream. The parcel was delivered on March 21, 2020, at approximately 10:41 a.m.

59.     On June 11, 2020, a United States Postal Inspector was reviewing United States Postal Service ("USPS") business records when a Priority Mail parcel was found to be suspicious.  The postal records indicated that a parcel had been shipped to "Jon Marshall" at **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**.  The Postal Inspector examined the USPS business records and open-source website information and determined that the parcel had been shipped from a company named "Kief Presses."  A review of the website for Kief Presses, http://www.kiefpresses.com, revealed that the company manufactured and sold four different presses, which the company described as "pollen" presses.  I am aware, based on my training and experience, that presses of this type are commonly used to compress powdered narcotics, such as fentanyl, heroin, and cocaine, into compressed "bricks" after they have been diluted with cutting agents.

60.     A review of postal records revealed that the parcel shipped to Jonte MARSHALL from Kief Presses was being tracked from Jonte MARSHALL's residence at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**. An Administrative Subpoena previously served on Charter Communications revealed that the internet service at that residence was subscribed to Jonte MARSHALL with an email address of idtr_black@yahoo.com.  That same day, MARSHALL was also due to receive another parcel from The Variety Shoppe, which case agents believe, based on the investigation to date, contained more lactose.  That package had also been shipped to **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**.  Both parcels were delivered on Friday, June 12, 2020.  Case agents believe that MARSHALL had purchased a press and additional quantities of a cutting

---

[4] Case agents believe this particular order contained a typo of MARSHALL's actual email address, idtr_blackk@yahoo.com, where the first letter, "i" was changed to an "l."

25

agent in order to manufacture additional quantities of fentanyl, heroin, and/or cocaine, and to press those powders into "brick" form.

### *Identification of Oscar RAMIREZ-RIVERA and Mirna MATA*

61.     On September 30, 2019, a Grand Jury subpoena was served on Apple for information related to (414) 779-1998, the cellular phone used by Jonte MARSHALL.  On October 10, 2019, case agents received a response from Apple.  The response identified the Apple ID associated with (414) 779-1998 as **idtr_black@yahoo.com**.  The Apple response further identified Jonte MARSHALL's email address as idtr_black@yahoo.com.

62.     On May 12, 2020, the Honorable William E. Duffin, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the Apple ID idtr_black@yahoo.com.  Case agents subsequently served that warrant on Apple.  On May 29, 2020, case agents received a response from Apple.  As detailed below, information received from Apple revealed that MARSHALL, using (414) 779-1998, was in regular contact with a subject later identified as Oscar RAMIREZ-RIVERA.  Case agents believe, based on the investigation to date, that RAMIREZ-RIVERA was a fentanyl source of supply to MARSHALL and that MARSHALL sent money to Arizona as payment for fentanyl received from RAMIREZ-RIVERA.

63.     The Apple response described above showed that from January 29, 2018, at 8:45 p.m.[5], through July 12, 2019, MARSHALL, using (414) 779-1998, exchanged numerous iMessages with (602) 391-0291, an Arizona phone number.  Many of these messages requested simply that one party call the other one.  Both MARSHALL and the user of (602) 391-0291 referred to each other as "Mano."  On February 13, 2018, at 7:55 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to (602) 391-0291 that read, "Text me your full name here."  On February 13, 2018, at 7:58 p.m., the user of (602)

---

[5] All times referenced in the Apple information are in UTC time.  Milwaukee, Wisconsin is five hours behind UTC times during daylight savings hours and six hours behind UTC during standard time.

391-0291 sent an iMessage back to MARSHALL at (414) 779-1998 that read, "Oscar Manuel Ramirez Rivera." On February 10, 2019, at 12:52 a.m., the user of (602) 391-0291 sent an iMessage to MARSHALL at (414) 779-1998. The iMessage contained a photograph of a State of Washington Identification Card in the name of Oscar Manuel RAMIREZ-RIVERA. The card listed an address in Yakima, Washington. On February 10, 2019, at 12:53 a.m., MARSHALL, using (414) 779-1998, sent an iMessage back to (602) 391-0291 that read, "CONGRATULATIONS U FUCKIN AMERICAN!!! Lol!!." On February 10, 2019, at 12:54 p.m., the user of (602) 391-0291 sent an iMessage to MARSHALL at (414) 779-1998 that read, "I wish." Case agents believe that RAMIREZ-RIVERA sent MARSHALL a photo of an identification card he had been issued. MARSHALL joked that RAMIREZ-RIVERA was now an American citizen. Case agents believe that Oscar Manuel RAMIREZ-RIVERA was the user of (602) 391-0291. The Apple responses further revealed instances dating back to 2016 of Oscar RAMIREZ-RIVERA's name being sent by MARSHALL, using (414) 779-1998, to others with directions to send wire transfers to or make deposits into bank accounts utilized by RAMIREZ-RIVERA.

64. On April 29, 2019, at 4:28 a.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at (414) 779-1998 containing a screenshot of the Cash App application. Cash App allows users to send money directly to each other without using a bank or telegram service. The screenshot contained the name "Luis Alberto Molina" and the username "$molinalui." Case agents believe this was a request by RAMIREZ-RIVERA for MARSHALL to send money to "Luis Alberto Molina." On April 30, 2019, at 9:44 p.m., MARSHALL, using (414) 779-1998, sent an iMessage containing a screenshot from Cash App to RAMIREZ-RIVERA at (602) 391-0291 that contained a message that read, "Cash couldn't be sent. This would exceed your $7,500/week limit." Case agents believe MARSHALL had attempted to send money to "Luis Alberto Molina," but the transaction was denied. On April 30, 2019, at 9:45 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 302-0291 that read, "Maybe $25 right now?" On April 30, 2019, at 9:48

27

p.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at (414) 779-1998 that read, "Can you send it the old way for Friday Mano we have no more food in the fridge." Case agents believe MARSHALL offered to send "$25," possibly a reference to $2,500 and RAMIREZ-RIVERA requested the money be sent in the same manner it had previously been sent and indicated they did not have any money at the moment ("food in the fridge"). On April 30, 2019, at 9:50 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 391-0291 that contained a screenshot from Cash App that read, "Your $2,500 payment will be sent shortly." On April 30, 2019, at 9:51 p.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at (414) 779-1998 that read, "To which one Mano." On April 30, 2019, at 9:54 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 391-0291 that read, "L." Case agents believe MARSHALL sent $2,500 to RAMIREZ-RIVERA for drugs previously received. RAMIREZ-RIVERA asked which account MARSHALL had sent the money to and MARSHALL replied "L," a reference to Luis Alberto Molina.

65.     On July 15, 2019, at 6:15 p.m., an iMessage was sent from (602) 703-0618 to (414) 779-1998 that read, "Mano call me." Case agents believe this was a new phone being used by Oscar Manuel RAMIREZ-RIVERA. An Administrative Subpoena to T-Mobile revealed this phone was subscribed to Maria Mata, 5201 S. 109th Ave., Tolleson, AZ 85353 and that service to the phone had been established on July 13, 2019. On December 10, 2019, at 2:36 p.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to (414) 779-1998 that contained a photo of two subjects, one of whom was Oscar RAMIREZ-RIVERA. Based on other iMessages, case agents are aware that RAMIREZ-RIVERA was arriving in Milwaukee that day. The photo appears to have been taken at General Mitchell International Airport in Milwaukee. Case agents believe RAMIREZ-RIVERA sent a photo of himself at the airport to tell MARSHALL he had arrived in Milwaukee. On February 22, 2020, at 5:42 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 703-0618 that read, "HAPPY

28

BIRTHDAY MANO!!! I'll call you in a few." Case agents are aware that Oscar RAMIREZ-RIVERA was born on February 22, 1992. For these reasons, case agents believe that Oscar RAMIREZ-RIVERA was the user of (602) 703-0618.

66. On November 28, 2019, at 11:25 p.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to MARSHALL at (414) 779-1998 that read, "Mano you put the old ready." On November 28, 2019, at 11:25 p.m., MARSHALL, using (414) 779-1998, sent an iMessage back to (602) 703-0618 that read, "Yup." On November 28, 2019, at 11:26 p.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage back to (414) 779-1998 that read, "Ok cool." On November 29, 2019, at 12:12 a.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to MARSHALL at (414) 779-1998 that read, "Mano I need the name who send it." On November 29, 2019, at 12:12 p.m., MARSHALL, using (414) 779-1998 sent an iMessage to RAMIREZ-RIVERA at (602) 703-0618 that read, "Lemonda Ward." On November 29, 2019, at 12:12 a.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to MARSHALL at (414) 779-1998 that read, "For both." On November 29, 2019, at 12:47 a.m., MARSHALL, using (414) 779-1998, sent two iMessages to RAMIREZ-RIVERA at (602) 703-0618 that read, "Yup" followed by "1k each." Case agents believe RAMIREZ-RIVERA asked MARSHALL to send money to him using a prior method they used to send money ("put the old"). MARSHALL told RAMIREZ-RIVERA he had sent the money. RAMIREZ-RIVERA asked for the name of the person that sent the money and MARSHALL told him they were sent by Lemonda WARD, a known courier for the MARSHALL DTO. RAMIREZ-RIVERA asked if that was the sender for both wires and MARSHALL said it was and that each of the wires was for $1,000. Case agents believe this money was payment for drugs MARSHALL previously received from RAMIREZ-RIVERA.

67. On June 19, 2020, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address idtr_black@yahoo.com that was in possession of Yahoo!. On June 30, 2020, case agents received a

response from Yahoo!. The response contained over 20,000 emails sent or received by MARSHALL from January 1, 2019, through June 19, 2020.

68.     Several of the emails revealed tracking updates from FedEx for parcels being sent from "John marshall, Blackout Investments LLC" on March 2, 2020; April 16, 2020; and May 19, 2020. Case agents are aware that Jonte MARSHALL is the registered agent for Blackout Investments LLC and that he frequently refers to himself as "John" in emails. The March 2, 2020, parcel was sent to "Oscar Ramirez" at a FedEx Ship Center in Los Angeles, California. The parcel was delivered on March 3, 2020 and was signed for by "O. Ramirez." The April 16, 2020, parcel was sent to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona. A review of public databases and social media information revealed that Oscar RAMIREZ-RIVERA shares several addresses and appears to be romantically involved with Mirna MATA-TORRES. Public databases and social media information indicate that Mirna MATA has a brother named Luis MATA-TORRES. This parcel was delivered on April 17, 2020. The May 19, 2020, parcel was also addressed to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona. This parcel was delivered on May 20, 2020. Case agents believe these parcels contained payment to Oscar RAMIREZ-RIVERA for drugs previously received by MARSHALL.

69.     On June 17, 2020, case agents sent an Administrative Subpoena to FedEx Express for information on parcels sent using the FedEx account of "John marshall, Blackout Investments LLC." On July 7, 2020, case agents received records from FedEx. The records confirmed the three parcels described above. The records also indicated seven additional parcels had been sent to Luis MATA-TORRES and one parcel had been sent to Cindi MATA. All the parcels were delivered to addresses known to be associated with Mirna MATA-TORRES and/or Oscar RAMIREZ-RIVERA or addresses that Oscar RAMIREZ-RIVERA had provided to Jonte MARSHALL via iMessage.

70.     A review of the text messages from the May 12, 2020, search warrant described above revealed that on January 31, 2019, at 9:45 p.m., MARSHALL, using (414) 779-1998, sent a message to

30

(602) 327-5427 that read, "Send Me Your Info ASAP."  On May 18, 2019, an Administrative Subpoena sent to T-Mobile revealed that this phone was subscribed to Maria Mata at 6514 W. Miami St., Phoenix, AZ 85043.  At 9:49 p.m., a message was sent from (602) 327-5427 to (414) 779-1998 that read, "Mirna r mata Torres" followed by a second message that read, "Yakima Washington."  As detailed above, Oscar RAMIREZ-RIVERA sent Jonte MARSHALL a photo of his Washington Identification Card which showed a Yakima, Washington address.  Additionally, on April 22, 2019, at 3:33 a.m., the user of (602) 327-5427 sent a message to MARSHALL at (414) 779-1998 that read, "$mirnamata."  At 3:35 a.m., MARSHALL sent a message back that read, "Ok I'll send the $5k for the down payment" followed by a second message that read, "for the truck."  Case agents believe this is a Cash App name where money can be sent between users via the Cash App phone application.  Finally, on June 24, 2019, at 7:33 a.m., a message was sent from (602) 327-5427 that read "Mirnatorres29@gmail.com."  Case agents believe the user of (602) 327-5427 provided their email address to MARSHALL.  At 11:26 p.m., MARSHALL sent a message back to (602) 327-5427 that read, "Yup hold on I'll do it in 10."  On June 25, 2019, at 12:05 a.m., MARSHALL sent a screenshot of his phone to (602) 327-5427.  The screenshot was of the PayPal phone application and showed a payment of $2,830.05 to PayPal user "Mirna Torres Mata."  Case agents believe these messages indicate that Mirna MATA-TORRES is the user of (602) 327-5427.  Jonte MARSHALL also had phone number (602) 327-5427 saved in his phone as "Mirna" and email address mirnatorres29@gmail.com saved in his phone as "Mirna Torres."

71.     On September 20, 2019, at 3:08 a.m., a message was sent from (602) 775-3202 to MARSHALL at (414) 779-1998 that contained the following link: https://www.paypal.me/matamirna. An Administrative Subpoena sent to T-Mobile revealed that (602) 775-3202 was subscribed to Maria Mata at 10620 W. Illinoi St., Tolleson, AZ 85353.  The subpoena also revealed that service for this phone had been established on September 14, 2019.  Case agents believe this is a PayPal link allowing MARSHALL to send money to that account using PayPal.  Additionally, on November 23, 2019, at 1:41

31

a.m., a message was sent from (602) 775-3202 to (414) 779-1998 that read, "mirnatorres29@gmail.com." Case agents believe the user of (602) 775-3202 was providing their email address to MARSHALL. Case agents believe these messages indicate that Mirna MATA-TORRES was the user of (602) 775-3202 and that this phone replaced (602) 327-5427.

72. Additionally, an examination of records for MARSHALL's cellular phone showed that MARSHALL was in contact with (602) 327-5427 218 times from June 28, 2016, until August 7, 2019, and then was in contact with (602) 775-3202 427 times from September 15, 2019, until May 27, 2021. A further review of messages between MARSHALL and (602) 327-5427 and (602) 775-3202 showed that MARSHALL was frequently asked by the user of these phones to call "Mano," believed to be a reference to Oscar RAMIREZ-RIVERA. As detailed above, RAMIREZ-RIVERA and MARSHALL frequently referred to each other as "Mano." Based on my training, experience, and conversations with other law enforcement members, I am aware that "Mano" constitutes the second syllable of the Spanish word "Hermano," meaning "brother." Additionally, I am aware that "Mana" constitutes the second syllable of the Spanish word "Hermana," meaning "sister." "Mano" and "Mana" are frequently used in Spanish slang language to mean "buddy" and are used interchangeably when speaking of a male or female. The user of (602) 775-3202 and MARSHALL refer to the user of that phone as "Mana." Case agents believe these factors further indicate that Mirna MATA-TORRES is the user of both (602) 327-5427 and (602) 775-3202.

73. On May 2, 2019, at 7:30 p.m., MARSHALL, using (414) 779-1998, sent a message to MATA-TORRES at (602) 327-5427 that read, "What's Buela's address my Moms gonna stop by." Case agents are aware, based on a review of text messages that the MARSHALL DTO frequently uses "Granny" as a slang term when referring to quantities of narcotics or drug proceeds. In this instance, MARSHALL used "Buela," a shortened version of the Spanish word "Abuela," meaning "grandmother." MATA-TORRES sent a message back to MARSHALL that read, "6514 W. Miami St., Phoenix, AZ

32

85043." As detailed above, (602) 327-5427 is subscribed to Maria MATA at 6514 W. Miami St., Phoenix, AZ 85043. A review of FedEx records showed that on May 2, 2019, MARSHALL sent a package from Milwaukee to Luis Mata Torres, 6514 W. Miami St., Phoenix, AZ 85043. This package was delivered on May 3, 2019. Case agents believe this package contained proceeds of drug trafficking being sent to Mirna MATA-TORRES and Oscar RAMIREZ-RIVERA as payment for drugs previously received on consignment.

74. On May 17, 2019, at 5:24 p.m., a message was sent from MARSHALL, using (414) 779-1998, to Mirna MATA-TORRES at (602) 327-5427, that read, "GOOD MORNING!!! Watch out for Granny." A review of FedEx records showed that on May 16, 2019, MARSHALL sent another package to Luis Mata Torres at 6514 W. Miami St., Phoenix, AZ 85043. This package was delivered on May 17, 2019. Case agents believe this package also contained proceeds of drug trafficking being sent to Mirna MATA-TORRES and Oscar RAMIREZ-RIVERA as payment for drugs previously received on consignment.

75. Case agents believes these messages show the involvement of Oscar RAMIREZ-RIVERA and Mirna MATA-TORRES in coordinating the shipment and delivery of narcotics and bulk currency proceeds of drug trafficking in furtherance of the drug trafficking and money laundering activities of the MARSHALL DTO.

### Seizures of Bulk United States Currency from
### Jonte MARSHALL and Oscar RAMIREZ-RIVERA

76. On July 20, 2020, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed warrants authorizing the search of (414) 779-1998, the phone used by Jonte MARSHALL, and (602) 703-0618, the phone used by Oscar RAMIREZ-RIVERA. More specifically, the warrants directed AT&T and T-Mobile to provide information about the location of (414) 779-1998 and (602) 703-0618 for a period of 45 days.

77.     Case agents monitoring the location of (602) 703-0618 observed that RAMIREZ-RIVERA had been primarily in the Phoenix, Arizona area until July 31, 2020. On July 31, 2020, RAMIREZ-RIVERA travelled from Phoenix to Los Angeles, California.  From July 31, 2020, until August 5, 2020, RAMIREZ-RIVERA remained in California and frequented the areas of Palmdale, California; Llano, California; and San Bernardino, California.  On August 5, 2020, RAMIREZ-RIVERA returned to the Phoenix area.  On Thursday, August 6, 2020, at 10:20 p.m., court-authorized positional information for (602) 703-0618 indicated that RAMIREZ-RIVERA was at the airport in Milwaukee, Wisconsin. RAMIREZ-RIVERA remained in the Milwaukee area and his phone was frequently observed at the same locations as MARSHALL's cellular phone.

78.     On August 12, 2020, at 8:50 a.m., court-authorized positional information for (602) 703-0618 indicated that RAMIREZ-RIVERA's cellular phone was in close proximity to **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**.  This is the location of Schweiger and Baumann Trucking LLC, a business owned by Jonte MARSHALL.  At 9:01 a.m., court-authorized positional information for (414) 779-1998, MARSHALL's cellular phone, indicated MARSHALL was also in that area.  At 9:20 a.m. and 9:35 a.m., (602) 703-0618 was located in close proximity to MARSHALL's residence at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**.  At 9:18 a.m. and 9:36 a.m., (414) 779-1998 remained near **7836 North Faulkner Road**.  At 9:50 a.m., (602) 703-0618 was again in the area of **7836 North Faulkner Road**.  At 10:05 a.m., (602) 703-0618 was located in the area of North 76th Street and West Brown Deer Road which is between MARSHALL's residence and **7836 North Faulkner Road**.  At 10:07 a.m., (414) 779-1998 was located near his residence.  At 10:20 a.m., (602) 703-0618 was located near North 76th Street and West Bradley Road which is approximately 13 blocks east of **7836 North Faulkner Road**.

79.     At 10:25 a.m., case agents began to conduct surveillance at **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**.  At 10:25 a.m., case agents observed Jonte MARSHALL's

34

black 2018 Cadillac Escalade, bearing Wisconsin license plates AGE-4015, parked in the southeast corner of the rear parking lot at that location. These license plates list to Blackout Investments LLC at **7836 North Faulkner Road, Milwaukee, Wisconsin**. Jonte MARSHALL is the registered agent for Blackout Investments LLC. Case agents also observed Jonte MARSHALL standing in the rear parking lot at that location. MARSHALL appeared to be taking a picture of a vehicle in a rear parking area. The vehicle could not be seen as it was parked between other large vehicles. Court-authorized positional information also confirmed that (414) 779-1998 was at that location at 10:25 a.m. Case agents established surveillance where they could observe vehicles coming and going from the business but could not observe most of the rear parking lot.

80.     At 10:35 a.m., court-authorized positional information for (602) 703-0618 indicated it was located near **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**. At 10:39 a.m., case agents observed a gray 2016 Jeep Grand Cherokee, bearing California license plates 8ADB961, drive from the rear parking lot and turn south on North Faulkner Road. These license plates list to Carlos ESTRADA at 13841 Beech Street, Victorville, California 92392. This vehicle was not followed. At 10:41 a.m., (414) 779-1998 was still located near **7836 North Faulkner Road**. At 10:48 a.m., case agents observed Jonte MARSHALL walk across the rear parking lot and enter the driver's seat of his Cadillac Escalade. MARSHALL drove the Escalade out of the parking lot and turned north on North Faulkner Road. Case agents attempted to locate MARSHALL's vehicle but were unsuccessful.

81.     At 10:49 a.m., court-authorized positional information for (602) 703-0618 indicated it was located near 7300 West Good Hope Road, Milwaukee, Wisconsin. Case agents went to that location in an attempt to locate RAMIREZ-RIVERA. At 10:58 a.m., case agents observed a commercial car carrier in the parking lot at approximately 7208 North 76th Street, Milwaukee, Wisconsin. Case agents observed a gray Jeep Grand Cherokee on the upper cargo area of the car carrier and confirmed that the license plate on the Jeep was the same license plate of the Jeep observed leaving 7836 North Faulkner

35

Road. Case agents were unable to locate RAMIREZ-RIVERA at that location and then began to conduct surveillance of the car carrier and Jeep.

82.     Case agents-maintained surveillance of the car carrier until it entered Interstate 94 eastbound toward Chicago, Illinois. The car carrier was followed into Racine County, Wisconsin. At 12:34 p.m., a Wisconsin State Patrol Inspector conducted a traffic stop of the car carrier for a safety inspection. After the initial traffic stop, the car carrier was relocated to the Racine Safety Weight Enforcement Facility for an inspection. The driver of the car carrier stated he had picked up all three of the vehicles on the car carrier from private parties in the Milwaukee area. The driver had shipping information on his phone which indicated the Jeep Grand Cherokee was being transported to Hesperia, California. The Inspector asked the driver to off-load the Jeep and one other vehicle so he could confirm the VIN numbers on each vehicle. The driver agreed to do so. A Wisconsin State Patrol Trooper then arrived on scene to assist the Inspector. The Trooper deployed his K-9 partner around the Jeep and the other vehicle and the K-9 alerted to the odor of controlled substances emanating from the Jeep. During a search of the Jeep, the Inspector and Trooper located an electronically controlled compartment behind the rear passenger seat. The compartment was observed to contain rubber-banded United States currency. The Inspector and Trooper dismantled the compartment and removed a large amount of United States currency. An official count later revealed that $508,140 in United States currency was located in the compartment. The Jeep was destined for Hesperia, California.

83.     On August 12, 2020, the DEA Detroit Field Division contacted Milwaukee case agents regarding a telephone deconfliction. The Detroit agents had received information from a source of information (SOI) related to the seizure of the currency from the Jeep Cherokee in Wisconsin and a possible future shipment of currency from Milwaukee. The SOI provided Detroit agents with specific information that Jonte MARSHALL and Oscar RAMIREZ-RIVERA planned to ship a second vehicle

from Milwaukee on August 13, 2020. The SOI provided agents with the vehicle pickup location and a description of the vehicle.

84. On August 13, 2020, Milwaukee case agents established surveillance at the vehicle pickup location, the same business owned by MARSHALL, located at **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**. At 8:36 a.m., case agents observed a white Ford Expedition parked in the rear of the building. At 12:39 p.m., case agents observed the black Cadillac Escalade, bearing Wisconsin license plate AGE-3015, driven by MARSHALL, arrive at the business and park in the rear. At 12:41 p.m., court-authorized positional information for (414) 779-1998 revealed that the phone was in close proximity to **7836 North Faulkner Road, Milwaukee, Wiscons**in. At 12:46 p.m., MARSHALL left the business northbound in the black Escalade. At 2:17 p.m., case agents observed a grey GMC Terrain, bearing Minnesota license plates DGA140, driven by a Hispanic male later identified as RAMIREZ-RIVERA arrive at the business and park in the rear. These license plates list to PV Holding Corporation, 2240 Airport Lane, Minneapolis, Minnesota 55450. PV Holding Corporation is a holding company for Avis and Budget rental cars. An Administrative Subpoena later revealed this vehicle had been rented by Jonte MARSHALL. At 2:19 p.m., court-authorized positional information for (602) 703-0618 revealed that the phone was in close proximity to **7836 North Faulkner Road, Milwaukee, Wisconsin**.

85. At 5:41 p.m., case agents observed a commercial car carrier arrive at the business and park in front on North Faulkner Road. The company name "Gigi Line" was printed on the side of the truck. Shortly thereafter, RAMIREZ-RIVERA drove a white 2005 Ford Expedition, bearing Wisconsin license plates AFH-7134, from the rear of the business and turned the vehicle over to the driver of the car carrier. These license plates list to Jonte MARSHALL at **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**. This vehicle matched the description of the vehicle previously

provided by the Detroit SOI. The driver loaded the Ford Expedition onto the car carrier while RAMIREZ-RIVERA watched.

86.      Agents conducted surveillance of the car carrier for approximately three hours as it picked up additional cars in West Bend, Wisconsin. After leaving that area, case agents followed the car carrier until it entered Interstate 94 toward Chicago, Illinois. At 9:43 p.m., as the car carrier was in Racine, County, Wisconsin, a traffic stop was conducted by the Wisconsin State Patrol. During the traffic stop and inspection, a Racine County Sheriff Deputy deployed his K-9, which gave a positive alert to the odor of controlled substances in the Ford Expedition. During a search of the vehicle, case agents located a large amount of US Currency concealed in a natural void in the driver's side rear quarter panel. An official count later determined that $100,020 had been seized from the vehicle. The Ford Expedition was destined for Tolleson, Arizona. Case agents are aware that RAMIREZ-RIVERA was believed to reside in Tolleson, Arizona at that time.

87.      Case agents believe both of these currency seizures represented payments by Jonte MARSHALL for drugs previously received and distributed by the MARSHALL DTO. Case agents further believe that Oscar RAMIREZ-RIVERA travelled to Milwaukee to oversee the shipment of the drug proceeds to Arizona and California at the direction of the Sources of Supply for narcotics distributed by the MARSHALL DTO and that the Jeep contained payment for narcotics while the Ford Expedition represented RAMIREZ-RIVERA's payment for coordinating the distribution of narcotics and return of proceeds of drug trafficking.

### *Seizure of Fentanyl and Cocaine in Route to MARSHALL DTO, Arrest of Richard CHAVEZ and Daniel RODRIGUEZ-LARA, and Identification of Humberto CORONEL-VEGA*

88.      On June 13, 2021, at 10:27 p.m., a Kansas Highway Patrol Trooper was monitoring traffic on US Highway 54 in Seward County, Kansas. The Trooper observed a 2022 Kenworth Semi Tractor, bearing Illinois license plate P1048444, towing a 2020 Sun Valley Car Carrier trailer, bearing Illinois

38

license plate 717079ST, eastbound on US Highway 54. The Trooper conducted a traffic stop of the car hauler for a commercial vehicle inspection. Upon inspecting the vehicles on the car carrier, the Trooper located a white 2013 Nissan Cube that had been shipped from California and was destined for Milwaukee, Wisconsin. A subsequent search of the Nissan Cube revealed electronically controlled compartments beneath both of the vehicle's front floorboards. These compartments were found to contain 16 kilogram-shaped packages of a substance that tested positive for fentanyl and 14 packages of a substance that tested positive for cocaine. Case agents believe this fentanyl and cocaine were being transported to Milwaukee, Wisconsin to be distributed in the Eastern District of Wisconsin. Case agents removed the narcotics from the vehicle and arranged for the vehicle to be transported to Wisconsin.

89. On June 14, 2021, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed a search warrant authorizing the search of the AT&T cellular phone assigned phone number (213) 379-2357. This phone had been utilized to arrange the shipment of the Nissan Cube. On June 16, 2021, at 7:45 a.m., court-authorized positional information for (213) 379-2357 showed that the phone was in close proximity to The Chalet Motel of Mequon at 10401 North Port Washington Road, Mequon, Wisconsin. Case agents responded to that location and observed a black 2016 Nissan Juke, bearing California license plates 8ROZ059.

90. On June 16, 2021, case agents met with the driver of the commercial car carrier in the Eastern District of Wisconsin. The concealed compartments in the Nissan Cube were filled with facsimile kilogram-shaped packages similar to those seized in Kansas. The Nissan Cube was equipped with tracking devices and an alarm which would alert case agents when the concealed compartments were opened. Case agents then conducted a controlled delivery of the Nissan Cube to its delivery destination.

91. After the car carrier arrived at the delivery location, the driver contacted (213) 379-2357 via text message and advised that the vehicle had arrived. The user of (213) 379-2357 stated his "friend"

would arrive shortly. Case agents observed three Hispanic males walk across the Chalet Motel parking lot and enter the Nissan Juke. These subjects were later identified as Daniel RODRIGUEZ-LARA, Richard CHAVEZ, and Humberto CORONEL-VEGA. The Nissan Juke, driven by CHAVEZ, was followed from the motel, and eventually arrived at the delivery location. Daniel RODRIGUEZ-LARA exited the Nissan Juke and received the Nissan Cube from the truck driver. RODRIGUEZ-LARA drove to a nearby Walmart and parked the Cube in the parking lot. He then entered the Nissan Juke and the vehicle drove out of the area.

92. Case agents maintained surveillance of the Nissan Juke, CHAVEZ, RODRIGUEZ-LARA, and CORONEL-VEGA, for approximately six hours at which time case agents lost sight of the vehicle and surveillance was terminated. Case agents maintained constant visual surveillance of the Nissan Cube, and no one returned to the vehicle. On June 16, 2021, at approximately 10:15 p.m., case agents maintaining surveillance of the Nissan Cube at Walmart observed a Yellow Cab taxi pull into the parking lot and stop near the Cube. RODRIGUEZ-LARA exited the taxi and entered the driver's seat of the Cube. Case agents followed the Cube to Rick's Car Care, 6121 West Mequon Road, Mequon, Wisconsin. RODRIGUEZ-LARA parked the vehicle in the parking lot and re-entered the same taxi, which had also arrived at the location. The taxi was followed to the Days Inn & Suites, 1840 North 6th Street, Milwaukee, Wisconsin. RODRIGUEZ-LARA exited the taxi and entered the hotel. Approximately 10 minutes later, RODRIGUEZ-LARA exited the hotel with CORONEL-VEGA. They walked around the neighborhood for approximately 15 minutes before returning to the hotel. Surveillance video later showed RODRIGUEZ-LARA and CORONEL-VEGA depart the hotel on June 17, 2021, at 12:12 a.m.

93. At approximately 12:50 a.m., case agents observed a 2006 Range Rover, bearing California license plates 6NNH477, enter the parking lot of Rick's Car Care. Case agents observed two subjects enter the Nissan Cube and drive the vehicle out of the area. The vehicle was followed to North

40

River Road south of Mequon Road where it pulled to the side of the road. Case agents received an alert that the concealed compartments inside the Cube had been opened. Case agents attempted to conduct a traffic stop of the Cube at which time the vehicle struck a law enforcement vehicle and fled at a high rate of speed. Eventually, the Cube crashed at the intersection of West County Line Road and North Wakefield Court, Bayside, Wisconsin. Both occupants of the vehicle fled and evaded capture. Case agents believe, based on the investigation to date, that CORONEL-VEGA was the driver of the Cube and Daniel RODRIGUEZ-LARA was the front passenger. A search of the vehicle revealed a pillowcase on the floor of the backseat which contained 14 of the facsimile kilogram-shaped packages that were previously hidden in the concealed compartment underneath the front passenger seat. Case agents subsequently arrested Richard CHAVEZ and Daniel RODRIGUEZ-LARA.

94. On June 22. 2021, a Grand Jury in the Eastern District of Wisconsin returned a true bill charging RODRIGUEZ-LARA and CHAVEZ with Conspiracy to Distribute Controlled Substances and Attempted Possession with the Intent to Distribute 5 kilograms or more of cocaine and 400 grams or more of fentanyl. CORONEL-VEGA continues to be sought.

95. On June 29, 2021, case agents interviewed Richard CHAVEZ pursuant to a proffer letter. CHAVEZ stated that he was involved in the shipment of the Nissan Cube from California to Wisconsin. CHAVEZ further stated that RODRIGUEZ-LARA and CORONEL-VEGA also travelled from California to Wisconsin to assist in the delivery of the Nissan Cube. CHAVEZ stated the fentanyl and cocaine in the vehicle were destined for a subject CHAVEZ knows as "Jon" who lives in Mequon, Wisconsin. CHAVEZ described "Jon" as an African American male 45-50 years old. CHAVEZ identified a photo of Jonte MARSHALL as the subject CHAVEZ knows as "Jon." CHAVEZ also described the location of MARSHALL's residence and pointed out the location on a map. The location identified by CHAVEZ was 8320 West Mourning Dove Court, Mequon, Wisconsin. Case agents are aware this is the residence of Jonte MARSHALL. CHAVEZ stated that within the last year he had

41

arranged the delivery of over 100 kilograms of fentanyl from California to Jonte MARSHALL in Wisconsin. CHAVEZ further stated that MARSHALL had shipped in excess of $3,000,000 in bulk United States currency from Wisconsin to California in the last year as payment for fentanyl received by the MARSHALL DTO.

96.     CHAVEZ also provided case agents with the phone number used by MARSHALL to coordinate the delivery of the fentanyl and cocaine seized in Kansas. Court-authorized positional information for that phone showed the phone travelled in tandem with the known phone used by MARSHALL for several days surrounding the expected delivery of the fentanyl and cocaine. Case agents believe this indicates that MARSHALL was carrying the phone during that time period. Case agents believe this further corroborates CHAVEZ's statement that Jonte MARSHALL was the intended recipient of the fentanyl and cocaine. CHAVEZ further identified Jose AISPURO-NIEBLA and Juan AISPURO-NIEBLA as the subjects responsible for arranging prior shipments of fentanyl to MARSHALL and for arranging the shipment of fentanyl and cocaine which was seized in Kansas.

97.     On July 22, 2022, at 1:01 p.m., court-authorized positional information for (414) 779-1998 indicated the phone was in close proximity to North Mayfair Road and West North Avenue, Wauwatosa, Wisconsin. A case agent responded to that area in an attempt to locate Jonte MARSHALL. At 1:31 p.m., the case agent located MARSHALL's white 2021 Cadillac Escalade, bearing Wisconsin license plate AND-5667, parked in the parking lot of Best Buy, 2401 North Mayfair Road, Wauwatosa, Wisconsin. These license plates list to Schweiger and Baumann and Jonte MARSHALL. The case agent established surveillance of the vehicle.

98.     At 1:49 p.m., the case agent observed Jonte MARSHALL walk from the entrance of Best Buy toward the Escalade. MARSHALL was accompanied by two Hispanic males. MARSHALL entered the driver's seat, and the two males entered the front and rear seats on the passenger side. MARSHALL drove the vehicle out of the parking lot and drove across the street into the parking lot of

42

Mayfair Mall. The case agent temporarily lost sight of the vehicle at 1:54 p.m. At 1:59 p.m., the case agent located the Escalade driving east in a parking aisle just south of the Tokyo Hut restaurant. The Escalade then drove north in the parking lot and parked near a mall entrance just north of Potbelly Sandwich Shop. The case agent again lost sight of the vehicle temporarily. When visual surveillance was re-established, the vehicle was unoccupied.

99.     On August 18, 2022, the case agent obtained surveillance video from Best Buy from July 22, 2022. The video shows MARSHALL and the two Hispanic males enter the store at 12:43 p.m. MARSHALL and the two males did no actual shopping while inside the store. They walked to an area of the store where they had conversation for several minutes. One of the Hispanic males appeared to be translating for the other. Whenever a customer or Best Buy employee came near MARSHALL and the males, they would relocate to a different part of the store and continue their conversation. This happened several times for approximately one hour. Case agents believe, based on the investigation to date and several nonverbal indicators observed on the surveillance, that MARSHALL and the males were involved in a negotiation. Case agents believe this negotiation involved the drug trafficking and money laundering activities of the MARSHALL DTO. MARSHALL and the males left the store at 1:48 p.m. and were observed driving back to the Mayfair Mall parking lot in MARSHALL's Cadillac. On September 15, 2022, case agents showed still photos from the Best Buy surveillance video to a Richard CHAVEZ who identified one of the males who met with MARSHALL as Jose AISPURO-NIEBLA, the subject who arranged the shipment of fentanyl and cocaine to MARSHALL which was seized in Kansas. Case agents believe the fact that MARSHALL was observed meeting with AISPURO-NIEBLA in the Milwaukee area in July 2022 indicates that MARSHALL is still involved in narcotics trafficking with AISPURO-NIEBLA.

***Additional Surveillance of MARSHALL DTO Members***

43

100.     On August 3, 2022, at 2:06 p.m., court-authorized positional information for (414) 779-1998 indicated the phone was in close proximity to **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)**. This is the location of the suspected stash house used by the MARSHALL DTO. At 2:17 p.m., a case agent established surveillance at that location and observed MARSHALL's white 2021 Cadillac Escalade, bearing Wisconsin license plate AND-5667, parked in the parking lot outside the entrance to the building at **11946 West Mill Road**. The case agent also observed a white 2015 Dodge Durango, bearing Wisconsin license plate AMT-3369, parked in the parking lot. These license plates list to Lemonda WARD, at 8819 West Herbert Avenue, Milwaukee, Wisconsin.

101.     At 2:39 p.m., the case agent observed Lemonda WARD walk from the entrance of **11946 West Mill Road** and enter the driver's seat of the white Durango. WARD drove out of the complex toward West Appleton Avenue. The case agent then observed Jonte MARSHALL walk from **11946 West Mill Road** and enter the driver's seat of the Cadillac Escalade. MARSHALL also drove out of the complex. Case agents maintained surveillance of WARD. At approximately 2:57 p.m., WARD turned east from North Swan Road onto Highlander Drive. Case agents are aware this road leads into a subdivision where MARSHALL's home at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)** is located. Case agents did not follow WARD into the subdivision so as not to be detected. At 3:03 p.m., a case agent entered the subdivision and observed WARD parked in the cul-de-sac outside of MARSHALL's residence. At 3:13 p.m., Case agents observed WARD's Dodge Durango exit the subdivision onto North Wauwatosa Road and drive south. Case agents continued surveillance of WARD. At approximately 3:27 p.m., WARD entered a parking lot adjacent to McDonald's at 8220 West Hampton Avenue, Milwaukee, Wisconsin. WARD remained in the parking lot for approximately two minutes before driving out. Case agents are aware this is a technique frequently used by drug traffickers to determine if they are being followed. A case agent observed a teenage girl in the back seat of the vehicle. Case agents continued surveillance of WARD until she stopped in front of her residence

44

at 8819 West Herbert Avenue, Milwaukee, Wisconsin. Case agents then established surveillance at that location but were unable to see the passenger side of the vehicle to determine if the teenage girl exited the vehicle. WARD did not exit the vehicle other than to open the driver's door slightly on several occasions. At 3:44 p.m., WARD drove away from the residence and case agents lost sight of the vehicle in heavy traffic. Case agents attempted to locate WARD but were unsuccessful. Surveillance was then terminated.

102.    On August 4, 2022, case agents again utilized court-authorized positional information for (414) 779-1998 to conduct surveillance of MARSHALL. At 12:01 p.m., court-authorized positional information indicated the phone was in close proximity to MARSHALL's residence at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**. Case agents established surveillance at that location. At 12:05 p.m., a different case agent located Lemonda WARD'S white 2015 Dodge Durango, bearing Wisconsin license plate AMT-3369, parked on the street in front of 8819 West Herbert Avenue, Milwaukee, Wisconsin and established surveillance at that location.

103.    At 12:10 p.m., a case agent observed a white van towing a trailer arrive at MARSHALL's residence. The van was driven by an unidentified African American male. The male did not exit the vehicle. The case agent then observed MARSHALL exit the residence and approach the van. MARSHALL engaged in conversation with the male and then handed the male a thick white envelope which the case agent believed may contain currency. The male departed the location at 12:25 p.m. Case agents were unable to obtain a license plate on the vehicle or trailer.

104.    At 12:13 p.m., a case agent observed Lemonda WARD walk from 8819 West Herbert Avenue, enter the driver's seat of the Durango, and drive away. The case agent maintained surveillance of WARD until she turned from North Wauwatosa Road into the subdivision where MARSHALL's home at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)** is located. At 12:31 p.m., a case agent observed WARD arrive at MARSHALL's residence and back into the driveway.

45

WARD did not exit the vehicle. Two children entered WARD's vehicle and she then drove away at about 12:43 p.m. Case agent then conducted surveillance of WARD.

105. At 12:52 p.m., case agents observed WARD's vehicle parked in the rear parking lot of Schweiger and Baumann Trucking, a business owned by MARSHALL, at **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**. This business was previously used by MARSHALL to ship vehicles containing bulk currency proceeds of drug trafficking. At 12:54 p.m., case agents observed WARD enter the driver's seat of the Durango. She then drove to the front parking lot of the business and stopped in a corner of the lot. WARD then drove out of the parking lot. Case agents continued surveillance of WARD to the area of North 60th Street and West Mill Road where he lost sight of her vehicle at 1:09 p.m. Surveillance of WARD was then terminated.

106. At 1:04 p.m., case agents observed MARSHALL enter his white Cadillac Escalade and drive away from his residence, but lost sight of MARSHALL at that time. At 1:16 p.m., court-authorized positional information for Target Cell Phone A indicated the phone was in the area of North 76th Street and West Good Hope Road. At approximately 1:20 p.m., a case agent established surveillance at **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)**, the location of a suspected stash house used by the MARSHALL DTO. At 1:23 p.m., the case agent observed MARSHALL's Cadillac Escalade enter the complex and park in front of **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)**. The case agents observed MARSHALL exit the Escalade and enter the building. At 1:27 p.m., the case agent observed MARSHALL exit the building, enter the Escalade, and drive out of the complex. MARSHALL turned onto West Appleton Avenue and then entered Interstate 41 southbound. Case agents lost sight of MARSHALL in heavy traffic.

107. At 1:47 p.m. and 2:02 p.m., court-authorized positional information indicated Target Cell Phone A was in close proximity to MARSHALL's former residence at **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target**

46

**Location C)**.  At 2:04 p.m., case agents went to that location and observed MARSHALL driving away from that location, but again lost sight of MARSHALL and were unable to locate him.  Surveillance was then terminated.

108.    On August 18, 2022, at 10:10 a.m., court-authorized positional information for (414) 779-1998 indicated the phone was in close proximity to Jonte MARSHALL's residence at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**.  Case agents established surveillance in the area of MARSHALL's residence.  At 10:32 a.m., case agents observed MARSHALL's white 2021 Cadillac Escalade, bearing Wisconsin license plate AND-5667, exit his subdivision and drive south on North Wauwatosa Road.  Case agents continued mobile surveillance of the vehicle.

109.    MARSHALL was followed to several different locations in the Milwaukee area. MARSHALL was then followed to **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)**, the location of the suspected stash house used by the MARSHALL DTO.  Case agents observed MARSHALL park in the parking lot at 4:00 p.m., exit the Escalade, and enter the building at 4:01 p.m. carrying a tan bag.  At 4:03 p.m., case agents observed MARSHALL exit the building empty-handed, enter the Escalade, and drive out of the parking lot.

110.    MARSHALL turned east on West Appleton Avenue and then entered the ramp for Interstate 41 south.  While on the ramp, case agents observed MARSHALL suddenly pull to the shoulder on the right and stop at 4:10 p.m.  Several case agents drove past MARSHALL.  MARSHALL then re-entered the ramp at 4:11 p.m. and continued south on Interstate 41.  At the exit ramp for West Hampton Avenue, case agents observed MARSHALL enter the "Exit Only" lane.  A case agent entered the "Exit Only" lane to follow MARSHALL, but MARSHALL continued onto the shoulder ahead and re-entered the Interstate.  Case agents are aware that drug traffickers will frequently drive erratically, pull to the side of the road, change lanes, or change their speed frequently as a means of conducting counter-

47

surveillance to determine if they are being followed.  Case agents believe that was the reason for MARSHALL's driving activities.

111.    MARSHALL eventually exited the Interstate at West Burleigh Street.  Case agents temporarily lost sight of the Escalade.  At 4:22 p.m., case agents located the Escalade parked, unoccupied, in the parking lot of a Wells Fargo Bank and office building at 2675 North Mayfair Road, Wauwatosa, Wisconsin.  Surveillance was then terminated.

### *Financial Information Related to Jonte MARSHALL*

#### *Personal Financial Accounts Belonging to Jonte MARSHALL*

112.    MARSHALL is currently the signor on Wells Fargo personal checking account x3866. The address listed for MARSHALL on bank statements as recent as May 31, 2022, is **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**.  MARSHALL made net deposits of $398.710.31 between January 1, 2018, and December 31, 2021.  These cash deposits were typically between $1,000.00 and $8,000.00 and were often conducted in a manner consistent with structuring currency transactions to avoid the $10,000 reporting requirement.

113.    MARSHALL is currently the signor on Educators Credit Union personal account x887. The address listed for MARSHALL on bank statements as recent as July 1, 2022, is **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**.

### *Businesses Operated by Jonte MARSHALL DTO*

#### *Schweiger & Baumann Trucking, LLC*

114.    According to Wisconsin Department of Financial Institutions records, Jonte MARSHALL is the registered agent of SCHWEIGER & BAUMANN TRUCKING, LLC.  The business was registered with the state on February 27, 2015.  The registered agent address and the principal office address is listed as **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**.

48

115. According to records provided by Educators Credit Union, checking account x4965 is held in the name of SCHWEIGER & BAUMANN TRUCKING LLC, JONTE P. MARSHALL. The address listed on bank statements for account x4965 as recently as May 31, 2022, is **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**. Case agents have reviewed the account records and found that:

a. MARSHALL opened the account on April 25, 2016, and he is the sole signor on the account;

b. Between April 25, 2016 and July 11, 2018, the transactions conducted in the account were generally consistent with that of a legitimate dump truck business. Deposits to the account were checks from area construction project managers and other dump truck companies. Expenses were paid to suppliers of truck parts, fleet servicing businesses, fuel suppliers, and other providers consistent with the trucking industry;

c. Between July 11, 2018 and October 13, 2021, there were several transactions in the account that were not consistent with a trucking company. These include cash deposits, checks drawn on the account payable to a home builder, and a wire transfers to a title company. These transactions are comingled with the legitimate trucking transactions and are listed below:

i. Fifty-five (55) cash deposits between $2,000.00 and $8,000.00 for a total of $309,340.00. There are several instances where the timing and amounts of the cash deposits are consistent with structuring of the deposits to avoid currency transaction reporting requirements;

ii. On July 24, 2018, MARSHALL deposited a $5,000.00 BMO Harris Bank cashier's check payable to SCHWEIGER & BAUMANN. Records provided by BMO Harris Bank show that MARSHALL purchased the check with cash;

49

iii.     On November 5, 2018, MARSHALL wrote a check for $5,000.00 to Veridian Homes.  Mortgage records subpoenaed from Wells Fargo Home Mortgage show this check was a partial escrow payment for a residence purchased by MARSHALL.  The address for the residence is 8320 West Mourning Dove Court, Mequon, Wisconsin;

iv.     On November 13, 2018, MARSHALL deposited a $40,000.00 cashier's check he purchased from BMO Harris Bank.  The source of the funds used to purchase the check is directly traceable to cash MARSHALL deposited to BMO x2263, which he held under the name BLACKOUT INVESTMENTS.  BMO x2263 is the same account MARSHALL deposited cash to immediately following the controlled purchase of illegal drugs on April 19, 2019;

v.     On November 30, 2018, MARSHALL wrote a check out of the account for $23,000.00 to Veridian Homes.  Mortgage records subpoenaed from Wells Fargo Bank show this check was a partial down payment on a residence purchased by MARSHALL at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**; and

vi.     MARSHALL wrote additional checks of $274,450.42 and $30,002.03 to Veridian homes on June 13, 2019 and July 1, 2019, respectively.

116.     Tax records for Schweiger & Baumann Trucking, LLC for years 2015 through 2021 were received pursuant to an ex parte order. Employment tax forms 940 and 941 for tax years 2017 through 2021 list Schweiger and Baumann's address as **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**.

<u>*Schweiger & Baumann Logistics, LLC*</u>

50

117.    According to records provided by North Shore Bank, checking account x7726 was opened on October 25, 2021, and is held in the name of SCHWEIGER & BAUMANN LOGISTICS, LLC.  The signors on the account are MARSHALL and Soraida CARTHRAN.  The signature card for the account lists CARTHRAN's employer as SCHWEIGER & BAUMANN LOGISTICS. CARTHRAN is believed to be MARSHALL's girlfriend.  The address listed on the account, as recently as July 29, 2022, is **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**.

*Blackout Investments, LLC*

118.    Wisconsin Department of Financial Institutions records show that MARSHALL is the registered agent for BLACKOUT INVESTMENTS, LLC.  The records show the registered agent office and the principal office as dissolved in 2018.

119.    Records form Wells Fargo Home Mortgage show that MARSHALL applied for a home loan in 2019.  As part of the loan process, Wells Fargo asked the borrower, MARSHALL, to explain what Blackout Investments LLC is for and if it was still in operation.  In a response dated May 30, 2019, the borrower responded "Blackout Investments LLC was a LLC I had originally to setup for rental properties prior to 2016.  The LLC is not operation and has been dissolved but I have not closed the business account yet."

120.    According to records from BMO Harris Bank, checking account x2263 is held in the name of BLACKOUT INVESTMENTS.   Case agents have reviewed the account records and found that:

a.      MARSHALL is the sole signor listed for BMO x2263;

b.      There is no activity consistent with a legitimate investment business.  The only deposits to the account are even dollar cash deposits.  Withdrawals include payments to airlines, ride sharing services, iTunes, dental practices, and a single $40,000.00 cashier's check;

c.      MARSHALL made cash deposits on 13 occasions between January 9, 2018, and

51

November 13, 2018. These deposits ranged from $1,000.00 to $5,020.00 and totaled $40,020.00. The only other deposits to the account were three purchase returns totaling $1,085.45. On November 13, 2018, MARSHALL used the funds in BMO x2263 to purchase a $40,000.00 cashier's check payable to SCHWEIGER & BAUMANN TRUCKING. These funds eventually flowed through to MARSHALL's purchase of the residence at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**; and

d.  BMO x2263 received the $1,000.00 cash deposit referenced in paragraph 22 above.

121.  According to records from BMO Harris Bank, MARSHALL opened checking account x6998 in the name of BLACKOUT INVESTMENTS LLC on August 17, 2020. The address associated with this account as recently as March 31, 2022, is **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**. Case agents have reviewed the account records and found that MARSHALL made total deposits of $162,353.22 to BMO account x6998 during the 19-month period of August 17, 2022, through March 31, 2022. Deposits are primarily made up of even dollar cash deposits, one check for $5,000.00 from a third party, and one $120,000.00 deposit consisting of proceeds from a sale of real property held by Twenty-Nine 11 Developments, LLC. Withdrawals from the account are not consistent with a real estate investment company. Withdrawals from the account include $43,148.31 in payments on vehicle loans related to Marshall's purchase of a 2019 Mercedes Benz SUV and MARSHALL's purchase of a 2021 Cadillac Escalade and transfers to other bank accounts held by MARSHALL. There is no activity in the account consistent with a property rental business.

122.  According to records from Wells Fargo Bank, checking account x2899 is held in the name of BLACKOUT INVESTMENTS. MARSHALL is the sole signor on the account. Account statements as recent as May 31, 2022, list an address of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**. Case agents reviewed the account records and found that:

a.     MARSHALL made cash deposits of $178,435.00 and $148,380.00 in 2020 and 2021 respectively. Most deposits were even dollar amounts of either $3,000.00, $4,000.00, $6,000.00, or $8,000.00. Many of the deposits were conducted in a fashion consistent with structuring of currency transactions to evade the bank's $10,000.00 cash transaction reporting requirement. Most of the deposited funds were then transferred to Wells Fargo Bank Account x3386 which is a personal account held solely by MARSHALL; and

b.     On May 7, 2020, MARSHALL deposited two $5,000.00 money orders purchased from Community Financial Service Center, a Milwaukee area money service business. Information obtained from Community Financial Service Center revealed that Lemonda WARD purchased both money orders on May 6, 2020. The money orders were purchased at different store locations. The first was purchased at 11:57 a.m. and the second was purchased at 12:27 p.m. These funds, along with funds made available by cash deposits to the Wells Fargo x2899 of $8,000.00 on May 11, 2020, $8,000.00 on May 12, 2022, and $6,000.00 on May 13, 2022, were used to fund a $25,391.00 wire on May 14, 2022, to Merit Title. The purpose of the wire was for MARSHALL's purchase of a single-family residence at 3783 North 62nd Street, Milwaukee, Wisconsin.

123.     According to records received from Byline bank, MARSHALL applied for a loan from Byline Bank in October 2021. The loan was for the purchase of real estate and an established liquor store located in Milwaukee, Wisconsin. Included in the loan application provided by Byline Bank was a one-year financial statement for Blackout Investments. The statements is labeled "RENTAL PROPERTY INCOME AND EXPENSES WORKSHEET FOR TAX PREPARATION TAX ID NUMBER 26-3044334. The financial statement includes the following information for calendar year 2021.

a.     Blackout Investments owns the following four properties:

53

     i.        3783 North 62nd Street, Milwaukee, Wisconsin;

     ii.       4172 North 72nd Street, Milwaukee, Wisconsin;

     iii.     3220 North 39th Street, Milwaukee, Wisconsin; and

     iv.     4018 West Center Street, Milwaukee, Wisconsin.

b.    The gross receipts generated by the four properties combined was $49,800.00.

c.    After accounting for expenses of $27,232.00, Blackout Investments showed a net profit of $22,568.00 for 2021.

124.    Net cash deposits to Blackout Investment's bank accounts were $150,585.00 in 2020 and $159,880.00 in 2021.  Cash deposits to Blackout Investments bank accounts in 2021 exceed gross receipts by over $100,000.00.

125.    Tax records for Jonte MARSHALL and Blackout Investments, LLC for years 2015 through 2021 were requested pursuant to an ex parte order. The response provided by IRS indicates no tax returns were filed on behalf of Blackout Investments LLC for years 2015 through 2021. MARSHALL's personal returns reports total rents received of $2,200.00 in 2016, $7,363.00 in 2017 and $8,400 in 2018, and zero rent in 2019.  There is no other income reported on MARSHALL's tax returns that is consistent with an investment business.

*Blackout Entertainment LLC*

126.    Wisconsin Department of Financial Institutions records show that Jonte MARSHALL was the registered agent for BLACKOUT ENTERTAINMENT, LLC.  The records show the business dissolved in 2017.

127.    Records from BMO Harris Bank show MARSHALL opened checking account x2025 in the name of BLACKOUT ENTERTAINMENT on August 20, 2020.  The address associated with this account and listed on bank statements as recently as December 31, 2021, is **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**.

54

128.     Total deposits to BMO Harris x2025 from August 20, 2020, through December 31, 2021, were $306,748.00.  Cash deposits total $268,450.00 and the deposit pattern is consistent with structuring of the transactions to avoid currency transaction reporting requirements.  Withdrawals from the account include over $37,000.00 in payment to airlines, $11,215.80 towards an auto loan held by MARSHALL, $85,647.50 in Cash App payments to various individuals, and transfers of funds to other accounts held by MARSHALL.

129.     Tax records for Jonte MARSHALL and Blackout Entertainment, LLC for years 2015 through 2021 were requested pursuant to an ex parte order. IRS records show that MARSHALL applied for and received a taxpayer identification number for Blackout Entertainment LLC. IRS records indicate that Blackout Entertainment LLC has never filed a tax return.  IRS records show no indication of wages ever being paid by Blackout Entertainment LLC.  MARSHALL's personal returns were analyzed and there is no income or expenses reported on the tax returns that is consistent with an entertainment business.

130.     Transactions from MARSHALL's personal accounts, Blackout Investments accounts, Blackout Entertainment account, and Schweiger & Baumann's trucking were all analyzed.  Between January 1, 2018, and December 31, 2022, MARSHALL deposited over $1.4 million in cash to these accounts.

131.     I know from my involvement in prior drug-related investigations that individuals who are involved in drug trafficking generate large amounts of cash from their sales.  These individuals use the cash, in part, to facilitate continued drug trafficking operations, and to purchase personal items such as vehicles, houses, jewelry, etc.

132.     I also know that drug traffickers deposit illegally obtained proceeds to accounts held by businesses they control and commingle those funds with legitimate gross receipts to make it appear that their wealth was legitimately obtained.  In addition, most drug traffickers know that cash deposits into

55

banks in excess of $10,000 must be reported to the government on a Currency Transaction Report. As a result, individuals will "structure" their cash transactions into smaller cash transactions, each of which is less than $10,000 but whose aggregate total would exceed $10,000.

133. Based on the above facts, I believe MARSHALL deposited drug proceeds into business bank accounts held by Schweiger & Baumann LLC, Blackout Investments LLC, and Blackout Entertainment LLC, MARSHALL often made deposits in a structured manner and often commingled the funds with legitimate business proceeds to conceal the source of the funds.

### *Real Estate Purchased by Jonte MARSHALL DTO*

#### *Wells Fargo Loan Documents*

134. According to records provided by Wells Fargo Home Mortgage, Jonte MARSHALL applied for a home loan on or about June 14, 2019. MARSHALL's loan file number ends 1466. Loan 1466 is related to MARSHALL'S purchase of a residence located at **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**. Case agents have reviewed the account records and found that:

A. The Uniform Residential Loan Application in the file contains the following information:

    i. The purchase price of the residence was $748,529.00. MARSHALL paid $28,000 in earnest money plus $276,252.10 at closing;

    ii. After credits, prepaid items, and fees, MARSHALL's loan was $449,117.00 at 4.25% with monthly payments of $2,209.39 before taxes and insurance; and

    iii. In the employment section of the loan application, MARSHALL lists being in the trucking industry for 3 years. He lists his gross income as $8,304.33 per month.

B. A SCHWEIGER & BAUMANN profit and loss statement (P&L) is contained in the loan file. The P&L lists total incoming funds to the business at $571,177.70 from January 1,

56

2018, through February 11, 2019.  Account records provided by Educators Credit Union show actual deposits to SCHWEIGER & BAUMAN's account total $721,952.70 during that time frame.  Much of the discrepancy between the P&L statement and the actual amount deposited is due to cash deposited to the account.

*Purchase of 11946 West Mill Road, Unit 25, Milwaukee, Wisconsin*

135.  MARSHALL purchased a single-family residence at **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)** on or about July 23, 2020.  The deed is held by Blackout Investments, LLC.  The closing file was obtained from Knight Barry Title.  Analysis of the closing file shows MARSHALL owed the seller of the residence $40,856.80.  Email correspondence in the closing file indicates that MARSHALL paid the seller the entire balance owed outside of closing.  There are no withdrawals from MARSHALL's known bank accounts consistent with the purchase of the residence.  Case agents believe that MARSHALL paid for the residence in cash.

136.  Despite being owned by Blackout Investments, **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)** was not listed by MARSHALL as one of his rental properties on the Blackout Investments Profit and Loss Statement he submitted to Byline Bank as part of a loan application he submitted in 2021.

*Purchase of 3783 N 62nd Street with assistance of Lemonda WARD*

137.  Jonte MARSHALL purchased a single-family residence at 3783 N 62nd Street on or about May 12, 2020.  MARSHALL paid for the residence with a $25,391.00 wire from the Wells Fargo Blackout Investments account x2899.  The funds were made available by the following deposits:

A.  May 7, 2020 – A $10,000 deposit consisting of two $5,000.00 money orders purchased from a Milwaukee area money service business named Community Financial Service Center.  Records provided by Community Financial Service Center show that both money orders were purchased by Lemonda WARD, with cash, on the same day, at two different

57

branch locations in Milwaukee;

B.     May 11, 2020 – An $8,000 cash deposit at the Wells Fargo bank branch located at 7600 W. Hampton Avenue, Milwaukee, Wisconsin;

C.     May 12, 2002 – An $8,000 cash deposit at the Wells Fargo bank branch located at 7600 W. Hampton Avenue, Milwaukee, Wisconsin; and

D.     May 13, 2020 – A $6,000 cash deposit at the Wells Fargo bank branch located at 7600 W. Hampton Avenue, Milwaukee, Wisconsin.

### *Purchase of 2021 Cadillac Escalade*

138.     Records obtained by auto dealer Hurst Autoplex show that MARSHALL purchased a 2021 Cadillac Escalade on May 18, 2021.  MARSHALL made a $40,000 down payment on the vehicle. The down payment consisted of a $5,000.00 wire on May 19, 2021 and a $35,000.00 wire on May 20, 2021.  Both wires originated from SCHWEIGER & BAUMANN TRUCKING's Educators Credit Union account x4965.  The funds available in account x4965 came, in part, from:

a.     An $11,000.00 transfer from Educators Credit Union account x8527 on May 14, 2021. Records from Educator's Credit Union show account x8527 is held by Irma ORTIZ.  The signature card and bank statements list ORTIZ's address is **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**.  On October 27, 2022, case agents drove past **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and observed a black Honda Accord in the driveway of the residence.  The vehicle was registered to Irma ORTIZ.  Account records provided by Educators Credit Union, Wells Fargo Bank, and North Shore Bank list **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** as Jonte MARSHALL's address.  ORTIZ deposited $15,020.00 in cash to her checking account x8527 between April 6, 2021 and May 13, 2021; and

b.     A $12,000.00 transfer from US Bank account x9265 on May 13, 2021.  Records obtained

by US Bank show account x9265 is held by MIDWEST ROCK AND GRAVEL TRUCKING, 4546 North 73rd Street, Milwaukee, Wisconsin. The signor on the account is Toyona HADLEY. The account has been open since January 3, 2019. There is no banking activity in the account consistent with a legitimate trucking company. The only deposits to the account are Economic Impact Disaster Loan payments, refunds of purchases, and a $6,000.00 cash deposit made on May 18, 2021.

139. Loan documents and loan repayment records through November 2021 related to the 2021 Cadillac Escalade were received from TD Ameritrade. The primary borrower listed on the loan is Schweiger & Baumann Trucking and the secondary borrower is Jonte MARSHALL. Loan records from May 18, 2021, show MARSHALL listed his address as **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and state that he rented the property for 5 years. Monthly payment records were received through October 14, 2021, and all listed **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** as MARSHALL's billing address.

*Use of Safe Deposit Boxes and Storage Unit*

140. As detailed above, I am aware that drug traffickers and money launderers utilize safe deposit boxes and storage units to further their drug trafficking and money laundering activities. I have participated in search warrants executed on safe deposit boxes and storage units where controlled substances, United States currency that was proceeds of drug trafficking, jewelry, vehicles, firearms, and other valuable items were recovered from safe deposit boxes and storage units. For example, on June 18, 2018, I participated in the search of a storage unit that resulted in the recovery of 34 handguns, $894,760 in United States currency, drug trafficking paraphernalia, laptop computers, designer sunglasses, and assorted photographs and documents. During the course of the current investigation into the drug trafficking and money laundering activities of the Jonte MARSHALL DTO, case agents are aware that Jonte MARSHALL has access to three safe deposit boxes and at least one storage unit.

59

141.     A Grand Jury Subpoena served on Educator's Credit Union for information related to Jonte MARSHALL revealed that MARSHALL rented **Safe Deposit Box # 2313 at Educator's Credit Union, 10811 W Park Place, Milwaukee, Wisconsin (Target Location F)**.  The signature card for the box was associated with an account held by MARSHALL which listed the address of **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**.  The annual rent payment for this safe deposit box was set to auto-renew annually.

142.     As detailed above, case agents have executed numerous search warrants related to Jonte MARSHALL's email address of idtr_black@yahoo.com.  The results of those warrants have revealed that Soraida Carthran, believed to be MARSHALL's girlfriend, has rented **Storage Unit # 3118 located at Public Storage, 11122 West Lincoln Avenue, West Allis, Wisconsin (Target Location I)** since at least 2016.  The account at Public Storage is listed in the name of Soraida Carthran at **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**.   The email address on the account, idtr_black@yahoo.com, and the phone number on the account, (414) 779-1998, both belong to Jonte MARSHALL. The most recent email, dated October 12, 2022, indicated that payment for the unit was due.

143.     It should be noted that this storage unit is in close proximity to **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**.  Additionally, court-authorized positional information for MARSHALL's phone, (414) 779-1998, indicates that MARSHALL is frequently in the area of **Storage Unit # 3118 located at Public Storage, 11122 West Lincoln Avenue, West Allis, Wisconsin (Target Location I)**.  Case agents believe that MARSHALL is using **Storage Unit # 3118 located at Public Storage, 11122 West Lincoln Avenue, West Allis, Wisconsin (Target Location I)** in furtherance of the drug trafficking and money laundering activities of the MARSHALL DTO.

*Utility Information Regarding Target Locations*

144.    On October 21, 2022, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address idtr_black@yahoo.com that was in possession of Oath Holdings.  On October 27, 2022, case agents received a response from Oath Holdings which included numerous emails sent to Jonte MARSHALL at idtr_black@yahoo.com.  A review of those emails showed that as of September 28, 2022, MARSHALL continues to maintain accounts with WE Energies for electric and gas service for:

    a.    **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**; and

    b.    **1929 South 97th Street, West Allis, Wisconsin (Target Location B)** and/or **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**[6].

145.    Case agents also reviewed business records from WE Energies which identified the following as being responsible for the utility accounts:

    a.    **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**: Jonte MARSHALL.  Active since 08-01-2019;

    b.    **1929 South 97th Street, West Allis, Wisconsin (Target Location B):**  Jonte MARSHALL. Active since 07-28-2015;

    c.    **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**:  Soraida CARTHRAN (believed to be MARSHALL's girlfriend).  Active since 05-01-2009l

    d.    **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)**:  No active account since 2020 when MARSHALL purchased the townhouse.  Case agents do not know how MARSHALL utilizes utilities at this location; and

    e.    **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**:  Schweiger and Baumann Trucking.  Active since 06-25-2020.

---

[6] MARSHALL has labeled this account simply as "West Allis."  Case agents believe this may include utilities for both the lower unit (**1929 South 97th Street, West Allis, Wisconsin (Target Location B)**) and/or the upper unit (**1931 South 97th Street, West Allis, Wisconsin (Target Location C)**).

146.    Case agents believe that MARSHALL maintains utility accounts at each of the Target Locations demonstrates that MARSHALL continues to maintain dominion and control over each of these locations and utilizes the locations in furtherance of the drug trafficking and money laundering activities of the MARSHALL DTO.

## V.    **CONCLUSION**

147.    Based on the facts contained within this affidavit, I believe that probable cause exists to believe that in the State and Eastern District of Wisconsin, and elsewhere Jonte MARSHALL and others:

a.  Knowingly conspired with each other, and others known and unknown, to possess with the intent to distribute and distribute in excess of five kilograms of cocaine, and 400 grams or more of Fentanyl both Schedule II controlled substances, all in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(A), and 846; and

b.  Knowingly and intentionally used a communication facility, to wit, a telephone, in facilitating the commission of any act or acts constituting a felony under Title 21, United States Code, Section 841(a)(1).  All in violation of Title 21, United States Code, Section 843(b).

c.  Knowingly conspired with each other, and others known and unknown, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, namely: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, distribution of controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections , 1956(a)(1)(B)(i) and 856 (h).

148.    Based on the facts contained within this affidavit, I further believe that probable cause exists to believe that evidence of the offenses described above will be found in:

a.  **8320 West Mourning Dove Court, Mequon, Wisconsin (Target Location A)**, to include all associated vehicles parked on the premises, the garage, and outbuildings, at this address. This property is utilized by Jonte MARSHALL.  Described as a multi-story residence

with blue siding, white trim, and a black roof.  The numbers 8320 appear on the east-facing side of the garage;

b.      **1929 South 97th Street, West Allis, Wisconsin (Target Location B)**, to include all associated vehicles parked on the premises, the garage, and outbuildings, at this address. This property is utilized by Jonte MARSHALL.  Described as a two-story residence with light brick exterior on the first floor, light blue siding on the second level, white trim, and a gray roof.  The numbers 1929 appear on the east-facing side of the residence to the left of the front door;

c.      **1931 South 97th Street, West Allis, Wisconsin (Target Location C)**, to include all associated vehicles parked on the premises, the garage, and outbuildings, at this address. This property is utilized by Jonte MARSHALL.  Described as a two-story residence with light brick exterior on the first floor, light blue siding on the second level, white trim, and a gray roof.  The numbers 1931 appear on the east-facing side of the residence to the left of the front door;

d.      **11946 West Mill Road # 25, Milwaukee, Wisconsin (Target Location D)**, to include all associated vehicles parked on the premises, the garage, and outbuildings, at this address. This property is utilized by Jonte MARSHALL.  Described as a townhouse in a multi-level, multiple unit building with a light brown brick exterior and light-colored trim.  The numbers "11946" appear on the gate leading into the building and in two different places on the east side of the building.  The numbers "25" appear to the right of the door to the townhouse;

e.      **7836 North Faulkner Road, Milwaukee, Wisconsin (Target Location E)**, to include all associated vehicles parked on the premises, the garage, and outbuildings, at this address. This property is utilized by Jonte MARSHALL.  Described as a commercial space in a multi-unit commercial building with a red brick front and tan upper exterior and white lower exterior in back and on the sides.  The numbers "7836" appear on a glass door on the west side of the building above a sign that reads "Schweiger & Baumann Trucking;

63

f.    **Safe Deposit Box # 2313 at Educator's Credit Union, 10811 W Park Place, Milwaukee, Wisconsin (Target Location F)**.  This is a safe deposit box rented by or otherwise associated with Jonte MARSHALL; and

g.    **Storage Unit # 3118 located at Public Storage, 11122 West Lincoln Avenue, West Allis, Wisconsin (Target Location G).**  This is a storage unit rented by Soraida Carthran and associated with Jonte MARSHALL.

## <u>ATTACHMENT A</u>

**Safe Deposit Box # 2313 at Educator's Credit Union, 10811 W Park Place, Milwaukee, Wisconsin (Target Location F)**.  This is a safe deposit box rented by or otherwise associated with Jonte MARSHALL.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

A.    Fentanyl, cocaine, and any other controlled substance, packaging materials, devices, and materials used to prepare fentanyl, cocaine, and other controlled substances for distribution, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution;

B.    Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

C.    Cash, currency, and financial instruments;

D.    All items related to the purchase of cryptocurrency, money orders, or other financial instruments, including receipts and invoices;

E.    Proceeds of narcotics offenses, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the use, acquisition and disposition of items of value;

F.    Documents related to the rental, lease, or ownership of property and/or storage units;

G.    Paraphernalia for packaging, processing, cutting, diluting, weighing, and distributing controlled substances, and for packaging cash drug proceeds, such as scales, funnels, heat sealing devices, plastic packaging, labels, stickers, presses, and money-counting devices;

H.    Documents related to rental, lease, or ownership of the search sites and other locations identified in the search warrant;

I.    Safe deposit box lease agreements and keys;

J.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances and individuals involved in that distribution;

K.    Firearms and any associated ammunition;

L.    Cellular phones, computers, and other electronic devices;

M.    Items that demonstrate use, ownership, access, or control of the Target Location or electronic devices located at the Target Location;

N.    With respect to any computer equipment or other electronic devices:

1.    Passwords, encryption keys, and other equipment or devices that may be necessary to access and use the computer equipment;

2.    Documents or other items demonstrating the presence or absence of computer software that would allow others to control the items, and presence or absence of security software designed to detect such malicious software;

3.    Documents or other items demonstrating the attachment of other computer hardware or storage media;

4.    Counter forensic programs and associated data that are designed to eliminate data;

5.    Items in the paragraphs above that are stored in computer media, as well as media capable of being ready by a computer (such as external and internal computer hard drives, memory sticks and thumb drives) and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic magnetic computer impulses or data. These devices include but are not limited to computers, computer tablets, cellular telephones, computer components, external hard drives, thumb drives, media cards, and other computer-related electronic devices;

6.    Any of the items described in the above paragraphs maintained in safes, desks, filing cabinets, or hidden compartments in the Target Location; and

7.    Items in the paragraphs-above that are stored in electronic media, including media capable of being read by a computer (such as external and internal computer hard drives, memory sticks, CDs, and thumb drives), and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data (such as, including but not limited to, cellular telephones and tablets).

O.    Records and items, including all communications (to include email records, text messages and hard copy correspondence) related to the generation of income, and regardless of whether such income was acquired lawfully or unlawfully, including but not limited to:

1.    employment, regardless of whether such employment is documented through this issuance of an IRS Form W-2 or Form 1099;

2.    the actual or attempted brokering, purchase, sale (or re-sale), or posting for sale of vehicles; and

3.    Records related to the operation of any corporations, limited liability companies, partnerships, sole proprietorships, or other business-generating entity, including but not limited to the following entities:

74

<blockquote>

a.    Blackout Entertainment LLC;

b.    Blackout Investments LLC;

c.    Blackout Holdings LLC;

d.    Schweiger & Baumann Trucking LLC;

e.    Schweiger & Baumann Logistics LLC; and

f.    Twenty-Nine 11 Developments LLC

</blockquote>

P.    Financial records for individuals and entities, including but not limited to records that include or reference the following: receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements and information, debit card statements and information, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns;

Q.    Records and items, including all communications (to include email records, text messages and hard copy correspondence), related to the payment (or non-payment) of Federal, State, or local taxes by individuals and entities due and owing based upon the generation of income, including draft tax returns, payroll and excise tax returns and other return-related information;

R.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

S.    Books, records, receipts, notes, ledgers, airline tickets, hotel receipts, money orders, and other papers relating to the distribution of controlled substances;

T.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

U.    Photographs of individuals, associates, their property, and their drugs; and

V.    Records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.